PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL
THOMAS E. MOSS, IDAHO BAR NO. 1058
UNITED STATES ATTORNEY
**ALAN G. BURROW, FLORIDA BAR NO. 327921**
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
MK PLAZA, PLAZA IV
800 PARK BOULEVARD, SUITE 600
BOISE, IDAHO 83712
TELEPHONE:  (208) 334-1211
FACSIMILE: (208) 334-1414

MICHAEL F. HERTZ, D.C. Bar #965780
DODGE WELLS, D.C. Bar #425194
CAROLYN G. MARK, D.C. Bar #254177
DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
P.O. BOX 261
BENJAMIN FRANKLIN STATION
WASHINGTON, DC  20044
TELEPHONE:  (202) 307-0256
FACSIMILE:  (202) 514-7361

U.S. DISTRICT COURT
U.S. BANKRUPTCY COURT
DISTRICT OF IDAHO

NOV 05 2004

4:00 M. REC'D
LODGED_____ FILED_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>Plaintiff, )<br><br>v. )<br><br>WASHINGTON GROUP INTERNATIONAL, )<br>INC. f/k/a MORRISON KNUDSEN )<br>CORPORATION; CONTRACK )<br>INTERNATIONAL, INC.;  and )<br>MISR SONS DEVELOPMENT S.A.E. )<br>a/k/a HASSAN ALLAM SONS, )<br><br>Defendants. )<br>) | Civil No.<br><br>CIV-04 555-EJL |

-1-

**ORIGINAL**

## COMPLAINT AND DEMAND FOR JURY TRIAL

The United States of America, on behalf of the United States Agency for International Development ("USAID"), and by and through the United States Attorney for this judicial district, represents as follows:

### Introduction

1.  This civil action is brought under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended; the Foreign Assistance Act of 1961, 22 U.S.C.,§ 2399b, as amended; and the common law theories of payment by mistake, unjust enrichment and fraud.

2.  This action arises out of the fraud and misrepresentation of the defendants to secure five separate United States Agency for International Development ("USAID") funded host country construction contracts with the Arab Republic of Egypt ("Egypt") and the defendants' subsequent submission of false claims to USAID through false payment demands and other false records and statements intended to induce payment from USAID.

### The Parties

3.  Plaintiff is the United States of America.  The transactions that are the subject of this complaint were financed by USAID, an agency of the United States Government.

4.  Defendant, Washington Group International, Inc. ("WGII") f/k/a Morrison Knudsen Corporation ("MK"), is a corporation organized under the laws

of the State of Delaware and doing business in the State of Idaho. During the periods of the complaint, WGII's predecessor in business was Washington International, Inc. and/or Morrison Knudsen Corporation, d/b/a Morrison Knudsen International, Inc. All of these companies were affiliated by common ownership, common management, and shared assets. During the periods of the complaint, the companies were collectively referred to as "MK".

5.     Defendant Contract International Inc., ("CII") is a corporation organized under the laws of Virginia with its principal place of business located within the State of Virginia.

6.     Defendant Misr Sons Development S.A.E., a/k/a Hassan Allam Sons ("HAS") is a corporation organized under the laws of the Arab Republic of Egypt with its principal place of business located within Egypt.

### Jurisdiction and Venue

7.     This Court has jurisdiction over the subject matter of this action under 31 U.S.C. §§ 3730 and 3732.

8.     This Court has jurisdiction over these defendants because defendant MK can be found and transacts business within this judicial district, or the defendants either committed the acts complained of within this jurisdiction or conspired to commit the acts complained of within this jurisdiction.

9.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and under 28 U.S.C. §§ 1391(b) and 1395(a).

## Background

10.     USAID, under the authority of the Foreign Assistance Act of 1961, P.L. 87-195, as amended, is the U.S. government agency that carries out economic and humanitarian assistance to various developing countries.

11.     Through various project grant agreements between the Government of Egypt and the United States of America, USAID financed the five separate infrastructure construction contracts complained of herein.

12.     The five construction contracts financed by USAID were host country contracts between the Government of Egypt (or its designated implementing agency) and a United States (U.S.) contractor.

13.     Host country contracting is a finance mechanism used by USAID to implement Project Grant Agreements by financing construction contracts between the host country government and the contractor.  Neither the United States Government nor USAID are parties to host country contracts.  Rather, USAID acts as the financier and, in its role as donor and steward of the use and expenditure of U.S. Government funds, exercises various approval rights throughout the process of competition, award and administration of host country contracts.

### A.     Secondary Cities Project

14.     The Secondary Cities Project is a major USAID funded infrastructure project valued at several hundreds of millions of dollars for rehabilitating, augmenting,

and extending the water and wastewater facilities in six Egyptian cities - Kom Ombo, Darawo, Nasr City (collectively "Aswan Cities"), Luxor, Mansoura, and Nuweiba.

15.    The National Organization of Potable Water and Sanitary Drainage (NOPWASD) has been the Egyptian government agency tasked with implementing the Secondary Cities Project and is responsible to the Ministry of Housing and Utilities of the Arab Republic of Egypt.

16.    On December 12, 1996, notice in the Commerce Business Daily ("CBD") was issued inviting U.S. construction service firms to submit Prequalification Applications for the Secondary Cities Project.  There were to be four separate fixed price host country contracts awarded by NOPWASD to the pre-qualified contractor deemed the lowest responsible and responsive bidder.  Pre-qualified bidders could bid on one or more of the anticipated contracts.

17.    The CBD notice specifically provided that all bidders were required to comply with applicable USAID nationality, source and origin regulations as defined in USAID Automated Directives System, Chapter 310 and supplemental references, including 22 CFR § 228 et seq.

18.    The CBD notice further provided that Prequalification Applicants would be required to submit a statement affirming that the applicant or the applicants, in the case of a joint venture, met USAID's nationality and source regulations.

19.    Upon information and belief, the defendants received or were otherwise aware of the CBD notice and the bidder eligibility requirements.

20.     The Prequalification Questionnaire obtained by prospective bidders pursuant to the CBD notice specifically solicited expressions of interest and submission of qualifications and experience from United States contractors, separately or in joint venture, to be pre-qualified for bidding on the contemplated Secondary Cities Project contracts.

21.     The intent of the prequalification, first and foremost, was to ensure that tenders/bids were received from bidders who satisfy USAID's "nationality and source" rules and who would be eligible for the resulting contract.

22.     The Prequalification Questionnaire indicated that only tenders/bids from pre-qualified individual or joint venture U.S. general contractors in compliance with USAID Geographic Code 000 (USA) for nationality and source regulations would be accepted.

23.     Prior to the February 16, 1997, deadline for submitting Prequalification Applications and before the determination of eligibility of pre-qualified U.S. contractors, defendants MK, CII and HAS, acting in concert, formed or agreed to form secret, undisclosed three-party joint ventures with the intended purpose of bidding on the Secondary Cities Project contracts despite the fact that HAS was not an eligible U.S. contractor and, if disclosed, would destroy the eligibility of these joint ventures from participating in the contemplated USAID funded host country contracts.

24.     The defendants, and each of them acting in concert with the other, obtained the Prequalification Questionnaire and caused to be submitted a

-6-

Prequalification Application for the express and implied purpose of becoming pre-qualified to bid on the anticipated USAID funded host country contracts for the Secondary Cities Project.

25.    The Prequalification Application for the Secondary Cities Project submitted by the defendants affirmatively guaranteed the truth and accuracy of all statements and information provided.

26.    The Prequalification Application for the Secondary Cities Projects submitted by the defendants, and/or on behalf of the defendants with each defendants' knowledge, represented that defendants MK and CII were partners in a joint venture operating under the name "Upper Egypt Constructors."

27.    The Prequalification Application for the Secondary Cities Projects submitted by the defendants, and/or on behalf of the defendants with each defendants' knowledge, was false and untrue in that it failed to disclose the actual identity of the parties that would make up the joint ventures that would bid on and benefit from the award of the Secondary Cities Contracts.  In particular, the Prequalification Application failed to disclose the identity and participation of HAS as a member of the joint ventures.

28.    As a result of these misrepresentations, the defendants were pre-qualified to bid on the Secondary Cities Project USAID-funded host country contracts as a sham two-party joint venture composed of Morrison Knudsen International, Inc. and Contrack International, Inc.

-7-

**1)    Aswan Cities, USAID Project No. 263-0236-02, Contract B**

**(Aswan Cities Contract)**

29.    In September 1997, an Invitation to Tenderers was issued on behalf of NOPWASD to all pre-qualified bidders for the Secondary Cities Project seeking tenders for Contract B, Aswan Cities of Kom Ombo, Darawo, and Nasr City ("Aswan Cities Contract"). The Invitation to Tenderers indicated that interested pre-qualified bidders should notify NOPWASD and request the Information for Tenderers materials, which provided specific details relating to the bidding, award, performance and payment for the Aswan Cities Contract.

30.    The Invitation to Tenderers noted that the Contractor would be required to enter into agreements with, and make certifications to, USAID in connection with the issuance of financing documents by USAID and the submission by the Contractor of invoices for payment. The procurement would be subject to regulations contained in applicable USAID guidance.

31.    Defendants MK and CII indicated their interest in bidding on the Aswan Cities Contract and requested and received the Information for Tenderers.

32.    The Information for Tenderers reiterated the Secondary Cities Project's prequalification requirements that "[t]he Employer will receive Tenders only from Pre-Qualified individual or joint venture United States General Contactors who have satisfied the eligibility requirements for this Contract...." and that "tenders will be accepted only from firms of the United States of America who qualify for eligibility

-8-

under the provisions of the USAID nationality rule as set forth in Clause 74 of the Conditions of Particular Application, Part II, in effect at the Tender Opening Date."

33.    The Information for Tenderers also required bidders to "submit with [their] certified information that the firm meets the conditions described in this Clause [74]" and stated that "[c]hanges in the constitution of the Joint Ventures of the pre-qualified U.S. Contractors can be made only with the approval of the employer [NOPWASD] and USAID prior to Tender Opening."

34.    Under Clause 74 of the Conditions of Particular Application, Part II of the Aswan Cities Contract, in order to be eligible for financing by USAID, the Contractor was required, among other things, to be of US nationality, and if the Contractor/supplier of services was a joint venture, then each member of the joint venture was required to meet the nationality and other related requirements contained in Clause 74.

35.    On May 6, 1998, the defendants caused their tender for the Aswan Cities Contract to be submitted through their pre-qualified sham two-party joint venture.

36.    As part of their tender, the defendants submitted a copy of a Joint Venture Agreement dated April 13, 1998, representing that the joint venture bidding on the Aswan Cities Contract consisted of two companies, to wit, defendants MK and CII.  A copy of that joint venture agreement is attached as Exhibit A and incorporated herein.

37.    The actual tendering joint venture was a secret, undisclosed three-party joint venture composed of defendants MK, CII, and HAS.  A copy of that joint venture agreement, also dated April 13, 1998, is attached as Exhibit B and incorporated herein.

38.     The defendants did not disclose to USAID the true nature and constitution of their secret, undisclosed three-party joint venture and/or any changes in the constitution of their sham two-party joint venture as pre-qualified.

39.     As a result of the misrepresentations of the defendants, NOPWASD awarded the Aswan Cities Contract to the entity represented as a two-party joint venture consisting of only defendants MK and CII on October 1, 1998.

40.     As a further result of the misrepresentations of the defendants, USAID, in its role as financier, approved the award and agreed to pay for the U.S. Dollar portion of the Aswan Cities Contract.

41.     Defendant HAS, as an Egyptian company, was not eligible, and had not been pre-qualified, to participate in the sham two-party joint venture that bid on and was awarded the Aswan Cities Contract.

42.     During every stage of the procurement process and throughout the course of the Aswan Cities Contract, defendant HAS enjoyed the rights and obligations of a member of the sham two-party joint venture that bid on and was awarded the Aswan Cities Contract.

43.     Defendant HAS' participation as an undisclosed and ineligible member of the joint venture that was awarded the Aswan Cities Contract renders the pre-qualified sham two-party joint venture ineligible for USAID financing.

44.     During the period between 1998 and October 2003, defendants submitted 54 invoices, as further identified by Exhibit C attached hereto and incorporated herein,

to NOPWASD.

45.    NOPWASD submitted the 54 invoices to AID.

46.    AID paid a total of $97,833,854.96 directly to the sham two-party joint venture for the 54 invoices submitted on the Aswan Cities Contract.

47.    The defendants received payment in full for each invoice submitted.

48.    Defendant MK, acting in concert with and on behalf of the other defendants, certified in each invoice that "[t]o the best of its information and belief any common service supplied under said contract meets the source, componentry and nationality requirements specified in the contract and/or letter of commitment."

49.    Each invoice and certification submitted by, or on behalf of, the defendants for payment by USAID was false and fraudulent in that defendants knowingly sought payment for a joint venture that was ineligible for USAID financing.

50.    Neither USAID, NOPWASD, nor the project engineer knew or should have known of the defendants' misrepresentations and fraudulent failure to disclose the actual identity of the parties that made up the secret, undisclosed three-party joint venture that bid on and performed the Aswan Cities Contract.

51.    USAID did not discover the defendants' fraud until 2002.

### 2)    Luxor, USAID Project No. 263-0236 Contract C

### (Luxor Contract)

52.    In September 1999, an Invitation to Tenderers was issued on behalf of NOPWASD to all pre-qualified bidders for the Secondary Cities Project seeking tenders

for Contract C, Wastewater Facilities for Luxor ("Luxor Contract"). The Invitation to Tenderers indicated that interested pre-qualified bidders should notify NOPWASD and request the Information for Tenderers materials, which provided specific details relating to the bidding, award, performance and payment for the Luxor Contract.

53.   The Invitation to Tenderers noted that the Contractor would be required to enter into agreements with, and make certifications to, USAID in connection with the issuance of financing documents by USAID and the submission by the Contractor of invoices for payment. The procurement would be subject to regulations contained in applicable USAID guidance.

54.   Defendants MK and CII indicated their interest in bidding on the Luxor Contract and requested and received the Information for Tenderers. The Information for Tenderers for the Luxor Contract reiterated the Secondary Cities Project's prequalification requirements that " [t]he Employer will receive Tenders only from Pre-Qualified individual or joint venture United States General Contractors who have satisfied the eligibility requirements for this Contract…" and that "[t]enders will be accepted only from firms of the United States of America who qualify for eligibility under the provisions of the USAID nationality rule as set forth in Clause 74 of the Conditions of Particular Application, Part II, in effect at the Tender Opening Date."

55.   The Information for Tenderers also required bidders to "submit with [their] certified information that the firm meets the conditions described in this Clause [74]" and stated that "[c]hanges in the constitution of the Joint Ventures of the pre-

-12-

qualified U.S. Contractors can be made only with the approval of the employer [NOPWASD] and USAID prior to Tender Opening."

56.    Under Clause 74 of the Conditions of Particular Application, Part II of the Luxor Contract, in order to be eligible for financing by USAID, the Contractor was required to be of US nationality, among other things, and if the Contractor/supplier of services was a joint venture, then each member of the joint venture was required to meet the nationality and other related requirements contained in Clause 74.

58.    On or about June 25, 2000, the defendants caused their tender for the Luxor Contract to be submitted through the pre-qualified sham two-party joint venture.

58.    As part of their tender, the defendants submitted a copy of a Joint Venture Agreement dated June 13, 2000, representing that the joint venture bidding on the Luxor Contract consisted of two companies, to wit, defendants MK and CII.  A copy of that joint venture is attached as Exhibit D and incorporated herein.

59.    Subsequent to the submission of the tenders, defendant Morrison Knudsen International, Inc. was acquired by and changed its name to Washington International, Inc. ("WII").

60.    As a result of the name change and concerns related to the filing for bankruptcy by WII's parent, Washington Group International Inc., the pre-qualified sham two-party joint venture re-confirmed it met the nationality requirements and financial capabilities required of all pre-qualified applicants.

-13-

61.     The actual tendering joint venture was a secret, undisclosed three-party joint venture composed of defendants MK, CII and HAS.  Attached as Exhibit E and F, respectively, are a letter dated June 4, 2001 regarding the Joint Venture Agreement between all the defendants and an unsigned copy of the undisclosed three-party joint venture between defendants MK, CII and HAS dated March 7, 2001.

62.     The defendants did not disclose to USAID the true nature and constitution of their secret, undisclosed three-party joint venture and/or any changes in the constitution of the sham two-party joint venture as pre-qualified.

63.     As a result of the misrepresentations of the defendants, on April 24, 2001, NOPWASD awarded and entered into the Luxor Contract with the entity represented as a two-party joint venture consisting of only defendants MK and CII.

64.     As a further result of the misrepresentations of the defendants, USAID, in its role as financier, approved the award and agreed to pay for the U.S. dollar portion of the Luxor Contract.

65.     Defendant HAS, as an Egyptian Company, was not eligible, and had not been pre-qualified, to participate in the sham two-party joint venture that bid on and was awarded the Luxor Contract.

66.     During every stage of the procurement process and throughout the course of the Luxor Contract, defendant HAS enjoyed the rights and obligations of a member of the sham two-party joint venture that was pre-qualified, bid on, and awarded the Luxor Contract.

-14-

67.    Defendant HAS' participation as an undisclosed and ineligible member of the joint venture that was awarded the Luxor Contract renders the pre-qualified sham two-party joint venture ineligible for USAID financing.

68.    During the period between 2001 and July 2004, defendants submitted 35 invoices, as further identified by Exhibit G attached hereto and incorporated herein, to NOPWASD.

69.    NOPWASD submitted the 35 invoices to AID.

70.    AID paid a total of $33,981,476.61 directly to the sham two-party joint venture for the 35 invoices submitted on the Luxor Contract.

71.    Defendant MK, acting in concert with and on behalf of the other defendants, certified in each invoice that "[t]o the best of its information and belief any common service supplied under said contract meets the source, componentry and nationality requirements specified in the contract and/or letter of commitment."

72.    Each invoice and certification submitted by, or on behalf of, the defendants for payment by USAID was false and fraudulent in that the defendants knowingly sought payment for a joint venture that was ineligible for USAID financing.

73.    Neither USAID, NOPWASD, nor the project engineer knew or should have known of the defendants' fraudulent failure to disclose the actual identity of the parties that made up the undisclosed three-party joint venture that would bid on and perform the Luxor Contract.

74.    USAID did not discover the defendants' fraud until 2002.

-15-

**B.    Telecommunications Sector Support Program**
**Design/Building Telephone Exchange Area Outside Plant Facilities (OSP II)**
**USAID Project No. 263-0223-05**

**(Defendants MK and HAS)**

75.    On January 23, 1997, notice in the Commerce Business Daily was issued inviting U.S. construction service firms to submit Prequalification Applications for the Telecommunications Sector Support Program Telephone Exchange Area Outside Plant Facilities ("OSPII Contract").

76.    The Telecommunications Sector Support Program is a major program for Telecom Egypt, an agency of the Ministry of Transport and Telecommunication of the Arab Republic of Egypt to expand the telecommunications infrastructure in Egypt. The Program is funded in part by a grant from USAID to Egypt (USAID Grant No. 263-0223 for the Telecommunications Sector Support Program).

77.    The CBD notice for the OSPII Contract specifically invited "expression of interest and submission of prequalification data from only U.S. (Geographic Code 000) telecommunications firms and joint ventures of such firms who can qualify through experience in performing similar work for Outside Plant (OSP) networks."

78.    The CBD notice further provided that a fixed price host country contract was anticipated and that applicants should demonstrate among other things the "ability to furnish telecommunication equipment, material and services of qualified personnel to meet the source, origin and nationality requirements of USAID geographic code 000 as set forth in Title 22 of the Code of Federal Regulations, part 228 (22 CFR Part 228)."

-16-

79.    Upon information and belief, defendants MK and HAS received or were otherwise aware of the CBD notice and the bidder eligibility requirements.

80.    The Prequalification Questionnaire for the OSPII Contract reiterated that only bids from pre-qualified individual or joint venture United States general contractors in compliance with USAID Geographic Code 000 (USA) for nationality and source regulations would be accepted.

81.    The intent of the prequalification, first and foremost, was to ensure that the bids were received from bidders who satisfy USAID's "nationality and source" rules and who would be eligible for the resulting OSPII contract.

82.    Prior to submitting the Prequalification Application in response to the Prequalification Questionnaire and before the determination of eligibility of pre-qualified US contractors for the OSPII Contract, defendants MK and HAS, acting in concert, formed or agreed to form a secret undisclosed two-party joint venture with the intended purpose of bidding on the OSPII contract despite the fact that HAS was not an eligible US contractor and would otherwise destroy the eligibility of the joint venture from participating in the contemplated USAID-funded OSPII Contract.

83.    On or about March 25, 1997, defendant MK submitted a prequalification application as a single entity in response to the Prequalification Questionnaire.

84.    Defendant MK, acting individually and behalf of defendant HAS, obtained the Prequalification Questionnaire and caused to be submitted the

-17-

Prequalification Application for the express and implied purpose of becoming pre-qualified to bid on the anticipated USAID-funded OSP II Contract.

85.    The Prequalification Application submitted by defendant MK and on behalf of defendant HAS, guaranteed the truth and accuracy of all statements and information provided in response to the Prequalification Questionnaire, including statements concerning the identity and nationality of the general contractor seeking prequalification.

86.    The Prequalification Application submitted by defendant MK on behalf of itself and defendant HAS was false in that it stated HAS would be a subcontractor.  In fact, defendants MK and HAS had agreed that HAS would participate with MK as members of a joint venture that would actually bid on and ultimately be awarded the OSPII Contract.

87.    As a result of these misrepresentations, and without USAID knowledge of the undisclosed joint venture, defendant MK was pre-qualified to bid on the USAID funded OSPII Contract.

88.    In November 1998, the Invitation to Bidders, Information for Bidders and related documents were issued and sent on behalf of Telecom Egypt to all five pre-qualified bidders for the OSPII Contract.

89.    The Invitation to Bidders and the Information for Bidders both specifically provided that the contemplated procurement would be subject to

-18-

regulations contained in the applicable USAID Handbooks and USAID Automated

Directive System (ADS).

90.     The Information for Bidders further provided that bids would only be

accepted from pre-qualified United States Design/Build Contractors who had

previously satisfied the eligibility requirements for the OSPII Contract, including the

requirement that the firms must be of United States of America nationality under the

provisions of the USAID nationality rules, as set forth in Clause 74 of the Conditions of

Contract.

91.     Clause 4, "Joint Ventures," of the Information for Bidders for the OSPII

Contract provided "[o]nly joint ventures established and qualified at the pre-

qualification stage are eligible to bid and, in such cases, the pre-qualified entity is the

legally established joint venture not its constituent organizations."

92.     Under Clause 74 of the Conditions of Particular Application, Part II of the

OSPII Contract, in order to be eligible for financing by USAID, the Contractor was

required, among other things, to be of US nationality, and if the Contractor/supplier of

services is a joint venture, then each member of the joint venture was required to meet

the nationality and other related requirements contained in Clause 74.

93.     On or about February 14, 1999, defendants MK and HAS submitted or

caused to be submitted a bid representing that MK was the bidding party and proposed

general contractor seeking the OSPII Contract.

94.     The actual tendering/bidding entity was a two-party joint venture consisting of defendants MK and HAS.  Attached as Exhibit H and incorporated herein is a copy of that joint venture agreement dated February 13, 1999.

95.     Defendants MK and HAS failed to disclose the existence, true nature, and constitution of their secret, undisclosed two-party joint venture and/or any changes in the constitution of the pre-qualified entity, MK.

96.     As a result of the misrepresentations of defendants MK and HAS, Telecom Egypt awarded and entered into the OSPII contract with the entity represented as only MK on August 30, 1999.

97.     As a further result of the misrepresentations of defendants MK and HAS, USAID, in its role as financier, approved the award and agreed to pay for the U.S. Dollar portion of the OSPII Contract.

98.     Defendant HAS, as an Egyptian company, was not eligible, and had not been pre-qualified, to bid on, be awarded or participate in the OSPII Contract as the general contractor, singularly, or as a member of a joint venture.

99.     During every stage of the procurement process and throughout the course of the OSPII Contract, defendant HAS, as a secret member of the undisclosed MK/HAS Joint Venture, enjoyed the rights and obligations of the general contractor for the OSPII Contract.

100.    The secret, undisclosed MK/HAS joint venture which bid on and performed the OSP II Contract was ineligible for USAID funding.

-20-

101.   During the course of the OSPII contract, defendants MK and HAS, through defendant MK, subcontracted with 3M, a Minnesota Company, to supply certain equipment cabinets for the OSPII Contract.

102.   These cabinets and related materials provided were not manufactured in the United States as required under Clause 74 of the Conditions of Particular Application, Part II of the OSPII Contract and the applicable source, origin and nationality regulations.

103.   Defendants MK and HAS knew or should have known that the equipment cabinets were not manufactured in the United States and, as such, were ineligible for USAID financing.

104.   During the period between 1999 and April 2003, defendant MK, on behalf of itself and defendant HAS, submitted 386 invoices to NOPWASD.

105.   NOPWASD submitted the 386 invoices to AID.

106.   AID paid a total of $40,750,074.39 directly to defendant MK for the 386 invoices submitted on the OSP II contract.

107.   Defendant MK, acting in concert with and on behalf of defendant HAS, certified in each invoice that "[to] the best of its information and belief any common service supplied under said contract meets the source, componentry and nationality requirements specified in the contract and/or letter of commitment."

108.   Each invoice and certification submitted by, or on behalf of, defendants MK and HAS for payment by USAID was false and fraudulent in that MK and HAS

-21-

knowingly sought payment for an undisclosed joint venture that was ineligible for USAID financing.

109.   Additionally, each invoice and certification submitted by MK and HAS seeking payment for the equipment cabinets and other related materials supplied by 3M was false and fraudulent insofar as the payment was sought for goods supplied outside of the U.S. in violation of Clause 74 and the applicable source origin and nationality rules, 22 CFR Part 228, et seq.

110.   As a result of the misrepresentations of defendants MK and HAS, USAID paid certain claims for payment, unaware that MK had entered into an ineligible joint venture with HAS, and unaware that certain goods and services procured under the OSPII contract violated the terms of the contract and the source origin and nationality regulations.

111.   Neither USAID, NOPWASD nor the project engineer knew or should have known of defendants' MK and HAS' misrepresentations and fraudulent failure to disclose the existence and identity of their joint venture that bid on and performed the OSPII Contract.

112.   USAID did not discover the defendants' fraud until 2002.

### C.   Canal Cities Project

113.   The Canal Cities Water and Wastewater Phase II project was a major USAID-funded multi-contractual infrastructure project valued at several hundred millions of dollars (USD) intended to provide urgently needed water and wastewater

-22-

facilities in the Canal Cities of Port Said, Ismailia and Suez.

114.   NOPWASD was the Egyptian government agency tasked with implementing the Canal Cities contracts.

115.   In 1989, NOPWASD solicited Prequalification Applications for Design/Build Contractors for Wastewater Treatment Facilities for the Canal Cities Project. Pre-qualified applicants would be eligible to bid on the anticipated Canal Cities contracts.

116.   Prequalification Applicants for the Canal Cities contracts were required to meet certain minimum qualification standards, including experience in similar projects within the United States. In the case of joint venture applicants, each joint venture member was required to qualify independently in order for the Joint Venture itself to qualify.

117.   The Prequalification Application provided, among other things, that "firms forming a joint venture for the purpose of becoming pre-qualified are required to submit a joint prequalification questionnaire in respect of all members of the joint venture association so constituted, supported by a copy of the Certificate of Articles of Constitution for the Association" and that information submitted regarding a joint venture, "must contain all of the assets and all of the liabilities of the …. joint venture."

118.   On or about March 18, 1989, defendant MK submitted a prequalification application as a single entity in response to the Prequalification Questionnaire.

119.   On or about June 4, 1990, defendant MK, in response to an addendum to

-23-

the Prequalification Application, provided to NOPWASD a Prequalification
Application Re-submittal.

120. This Prequalification Application Re-submittal noted the possible
intention to joint venture with the firm Camp, Dresser and McKee, International.
Defendant MK did not disclose an intent to form a joint venture or joint ventures with
defendants CII and HAS.

121. Thereafter, in or about September 1991, defendant MK submitted
additional information for prequalification concerning its corporate structure. Again it
was seeking prequalification as a single entity and not as a joint venture with any other
entity.

122. Defendant MK, acting individually and on behalf the other defendants,
obtained the Prequalification Questionnaire and caused to be submitted the
Prequalification Application and Re-submittal applications for the express and implied
purpose of becoming pre-qualified to bid on the anticipated USAID funded host
country contracts for the Canal Cities Project.

123. The Prequalification Application submitted by defendant MK and on
behalf of the joint venture and all the defendants guaranteed the truth and accuracy of
all statements and information provided in response to the Prequalification
Questionnaire.

124. The Prequalification Application and Re-Submittal applications submitted
by MK, on behalf of the joint venture and all of the defendants with the defendants'

-24-

knowledge, was false and untrue in that it failed to disclose the existence and constitution of the joint venture or joint ventures which was/were the actual entity/ies seeking pre-qualification and bidding on the Canal Cities contracts.

125.   As a result of the misrepresentations, and without USAID knowledge of the undisclosed joint venture/s, defendant MK was pre-qualified to bid on the Canal Cities Project contracts.

### 1)   City of Ismalia, USAID Project No. 263-0174-02

126.   In early 1992, an Invitation to Bidders was issued on behalf of NOPWASD to all pre-qualified bidders for the Canal Cities Project seeking bids for the design/build construction of a wastewater treatment plant in the City of Ismailia capable of providing primary level treatment ("Ismailia Contract").

127.   Thereafter, on August 27, 1992, the defendants, through defendant MK, submitted their commercial tender for the Ismailia Contract.

128.   The tender submitted by defendant MK, on behalf of all the defendants, failed to disclose that MK had joint ventured with defendants CII and HAS despite the fact that neither CII nor HAS had been or could have been pre-qualified either individually or as a member of a joint venture.

129.   As a result of the misrepresentations of the defendants, and without USAID knowledge of the undisclosed joint venture, NOPWASD awarded the Ismailia Contract to defendant MK on October 26, 1992.

130.   As a further result of the misrepresentations of the defendants, USAID, in

-25-

its role as financier, approved the award and agreed to pay for the U.S. Dollar portion of the Ismailia Contract.

131.   Neither defendant CII nor defendant HAS had the requisite experience or qualifications required to be pre-qualified and, as such, they were not eligible, and had not been pre-qualified, to bid on, be awarded or participate in the Ismailia Contract as the prime contractor, singularly, or as a member of a joint venture.

132.   During every stage of the procurement process and throughout the course of the Ismailia Contract, defendants MK, CII and HAS, as secret members of the undisclosed joint venture, enjoyed the rights and obligations of the prime contractor for the Ismailia Contract.

133.   The secret, undisclosed three-party joint venture of the defendants which bid on and performed the Ismailia Contract was ineligible for USAID financing.

134.   Beginning in 1993 and continuing thereafter through at least April 1995, defendant MK acting in concert with and on behalf of the other defendants, submitted 80 invoices for payment, as further identified by Exhibit I attached hereto and incorporated herein, to NOPWASD.

135.   NOPWASD submitted the 80 invoices to AID.

136.   AID paid a total of $91,247,076 directly to defendant MK for the 80 invoices submitted on the Ismailia Contract.

137.   The defendants received payment in full for each invoice submitted under the Ismailia Contract.

138.   Each invoice and certification submitted by MK on behalf of the defendants for payment by USAID for the Ismailia Contract was false and fraudulent in that defendants knowingly sought payment for an undisclosed three-party joint venture that was ineligible for USAID financing.

139.   Neither USAID, NOPWASD, nor the project engineer knew or should have known of the defendants' misrepresentations and fraudulent failure to disclose the existence, true nature, and constitution of the actual undisclosed three-party joint venture that was performing the contract and obtaining the benefit of USAID financing.

140.   USAID did not discover the defendants' fraud until 2002.

### 2)   City of Port Said, USAID Project No. 263-0174-02

141.   In 1992, an Invitation to Bidders was issued on behalf of NOPWASD to all pre-qualified bidders for the Canal Cities Project seeking bids for the design/build construction of a primary level wastewater treatment plant and the rehabilitation and construction of sewage transmission lines in the City of Port Said. ("Port Said Contract").

142.   Thereafter, on September 30, 1993, the defendants, through defendant MK, submitted their tender for the Port Said Contract.

143.   The tender submitted by defendant MK on behalf of all the defendants, failed to disclose that MK had joint ventured with defendants CII and HAS despite the fact that neither CII nor HAS had been or could have been pre-qualified either individually or as a member of a joint venture.

-27-

144.   As a result of the misrepresentations of the defendants, and without USAID knowledge of the undisclosed joint ventures, NOPWASD awarded the Port Said Contract to MK on December 1, 1993.

145.   As a further result of the misrepresentations of the defendants, USAID, in its role as financier, approved the award and agreed to pay for the U.S. Dollar portion of the Port Said Contract.

146.   Neither defendants CII nor HAS had the requisite experience or qualifications required to be pre-qualified and, as such, they were not eligible, and had not been pre-qualified, to bid on, be awarded or participate in the Port Said Contract as the prime contractor, singularly are as a member of a joint venture.

147.   During every stage of the procurement process and throughout the course of the Port Said Contract, defendants MK, CII and HAS as secret members of the undisclosed joint venture, enjoyed the rights and obligations of the prime contractor for the Port Said Contract.

148.   The secret undisclosed three-party joint venture of the defendants which bid on and performed the Port Said Contract was ineligible for USAID financing.

149.   Beginning in 1993 and continuing thereafter through August 2000, defendant MK acting in concert with and on behalf of the other defendants, submitted at least 69 invoices for payment, as further identified by Exhibit J attached hereto and incorporated herein, to NOPWASD.

150.   NOPWASD submitted the 69 invoices to AID.

-28-

151. AID paid a total of $109,176,009 directly to defendant MK for the 69 invoices submitted on the Port Said Contract.

152. The defendants received payment in full for each invoice submitted under the Port Said Contract.

153. Each invoice and certification submitted by MK on behalf of the defendants for payment by USAID for the Port Said Contracts was false and fraudulent in that defendants knowingly sought payment for an undisclosed joint venture that was ineligible for USAID financing.

154. Neither USAID, NOPWASD, nor the project engineer knew or should have known of the defendants' misrepresentations and fraudulent failure to disclose the existence, true nature, and constitution of the actual undisclosed three-party joint venture that was performing the contract and obtaining the benefit of USAID financing of the Port Said Contract.

155. USAID did not discover the defendants' fraud until 2002.

## Count I
### (False Claims Act)

156. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended, against all defendants on the Aswan Cities Contract, the Luxor Contract, the Ismailia Contract, and the Port Said Contract.

157. Plaintiff restates and incorporates by reference the allegations set forth above in paragraphs 1- 74 and paragraphs 113-155 as if set forth fully herein.

158.   By virtue of the acts set forth above, defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment on the Aswan Cities Contract, the Luxor Contract, the Ismailia Contract, and the Port Said Contract, in violation of 31 U.S.C. § 3729(a)(1).  Defendants knew that these claims for payment were false, fraudulent or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.  These claims, therefore, were false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1).

159.   By virtue of the acts set forth above, defendants knowingly made and used, or caused to be made or used, false statements to get false or fraudulent claims paid by the United States on the Aswan Cities Contract, the Luxor Contract, the Ismailia Contract, and the Port Said Contract, in violation of 31 U.S.C. § 3729(a)(2).

160.   By virtue of the acts set forth above, defendants conspired with each other and other unnamed co-conspirators, to defraud the United States by getting false or fraudulent claims paid or approved on the Aswan Cities Contract, the Luxor Contract, the Ismailia Contract, and the Port Said Contract, in violation of 31 U.S.C. § 3729(a)(3).

161.   By virtue of the acts set forth above, plaintiff United States paid false or fraudulent claims on the Aswan Cities Contract, the Luxor Contract, the Ismailia Contract, and the Port Said Contract.

162.   By reason of these payments, the United States has incurred damages in an amount to be determined at trial.

## Count II
### (Foreign Assistance Act of 1961)

163.   This is a claim for double damages and civil penalties under the Foreign Assistance Act of 1961, 22 U.S.C. §2399b.

164.   Plaintiff restates and incorporates by reference the allegations set forth above in paragraphs 1- 74 and paragraphs 113-155 as if set forth fully herein.

165.   The United States financed the Aswan Cities Contract, the Luxor Contract, the Ismailia Contract, and the Port Said Contract with funds made available under the Foreign Assistance Act of 1961, 22 U.S.C. § 2151.

166.   By virtue of the acts set forth above, the defendants and each of them engaged in fraudulent tricks, schemes and devices for the purpose of securing and obtaining or aiding to secure or obtain benefits and the payment of funds in connection with the procurement, award and performance of each of the aforesaid contracts.

167.   The defendants and each of them further made and caused to be made and presented to USAID claims, through the submission of 238 invoices.

168.   The defendants and each of them knew the claims for payments to be false, fraudulent and fictitious insofar as they had purposefully failed to disclose the existence, true nature and constitution of three-party joint venture that actually submitted the tender and performed on each of the aforesaid contracts.

-31-

169.   As a result, the defendants have violated the Foreign Assistance Act of 1961, Section 640A(a), as amended, codified at 22 U.S.C. §2399b, and shall forfeit and refund any payment, compensation and advance received and shall pay to the United States for each such act, the sum of $2000 and double the amount of any damage which the United States may have sustained by reason thereof, or an amount equal to 50 per centum of any such payment, compensation and advance so received, whichever is greater together with costs of suit.

### Count III
### (Unjust Enrichment)

170.   This is an action by the United States for damages to recover money paid to defendants on the Aswan Cities Contract, the Luxor Contract, the Ismailia Contract, and the Port Said Contract, by which defendants have been unjustly enriched.

171.   Plaintiff restates and incorporates by reference the allegations set forth above in paragraphs 1 - 74 and paragraphs 113 - 155 as if set forth fully herein.

172.   By reasons of the payments by the United States on the aforesaid contracts, defendants have received money to which they were not entitled and by which defendants have been unjustly enriched.

173.   The defendants and each of them have been unjustly enriched by virtue of the fraud and misrepresentations used to pre-qualify and be awarded the aforesaid contracts in the amount equal to at least the U.S. dollar portion of the invoices paid by the United States.

-32-

174.   The defendants' unjust enrichment has been to the detriment of the United States in that USAID approved the award of the aforesaid contracts and paid the invoices submitted by or on behalf of the defendants for a joint venture that was not eligible to receive USAID funds and which USAID would not have paid if it had known of the fraud and misrepresentations and illegal joint venture.

175.   The defendants and each of them is therefore jointly and severally liable to the United States for the amount of the unjust enrichment in an amount to be determined at trial.

### Count IV
### (Payment By Mistake)

176.   This is an action by the United States to recover money paid to defendants under a mistake of fact on the Aswan Cities Contract, the Luxor Contract, the Ismailia Contract, and the Port Said Contract.

177.   Plaintiff restates and incorporates by reference the allegations set forth above in paragraphs 1- 74 and paragraphs 113 - 155 as if set forth fully herein.

178.   Based upon the defendants' fraud in obtaining the aforesaid contracts and subsequent false statements and false claims by the defendants for payment, the United States of America has paid to the defendants a total of $332,238,416.57 under the aforesaid contracts.

179.   Plaintiff United States has paid these funds to the defendants under the mistaken belief that the defendants were eligible to bid on the aforesaid contracts and

that the aforesaid contracts were awarded and the work performed in accordance with the terms of the contracts and USAID regulations.

180.   Plaintiff's mistaken beliefs were material to the amount of the payments made by plaintiff in that the Government would have not paid if it had known about the unauthorized joint ventures.

181.   Because of these mistakes of fact, defendants have received money to which they are not entitled.

182.   By reasons of these payments, plaintiff is entitled to damages in an amount to be determined at trial.

## Count V
### (False Claims Act)

183.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, as amended, against defendants MK and HAS on the OSPII Contract.

184.   Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1- 13 and paragraphs 75 - 112 as if set forth fully herein.

185.   By virtue of the acts set forth above, defendants MK and HAS knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment on the OSPII Contract, in violation of 31 U.S.C. § 3729(a)(1).  Defendants MK and HAS knew that these claims for payment were false, fraudulent or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless

disregard of whether said claims were true or false.  These claims, therefore, were false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1).

186.   By virtue of the acts set forth above, defendants MK and HAS knowingly made and used, or caused to be made or used, false statements to get false or fraudulent claims paid by the United States on the OSP II Contract, in violation of 31 U.S.C. § 3729(a)(2).

187.   By virtue of the acts set forth above, defendants MK and HAS conspired with each other and other unnamed co-conspirators, to defraud the United States by getting false or fraudulent claims paid or approved on the OSP II Contract, in violation of 31 U.S.C. § 3729(a)(3).

188.   By virtue of the acts set forth above, plaintiff United States paid false or fraudulent claims on the OSP II Contract.

189.   By reason of these payments, the United States has incurred damages in an amount to be determined at trial.

## Count VI
### (Foreign Assistance Act of 1961 – OSP II Contract)

190.   This is a claim for double damages and civil penalties under the Foreign Assistance Act of 1961, 22 U.S.C. §2399b, against defendants MK and HAS on the OSPII Contract.

191.    Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1 -13 and paragraphs 75 - 112 as if set forth fully herein.

192.    The United States financed the OSP II Contract with funds made available under the Foreign Assistance Act of 1961, 22 U.S.C. § 2151.

193.    By the acts so alleged, the defendants and each of them engaged in fraudulent tricks, schemes and devices for the purpose of securing and obtaining or aiding to secure or obtain benefits and the payment of funds in connection with the procurement, award and performance of the OSPII Contract.

194.    The defendants and each of them further made and caused to be made and presented to USAID claims for payment, through the submission of 386 invoices.

195.    The defendants and each of them knew the claims for payments to be false, fraudulent and fictitious insofar as they had purposefully failed to disclose the existence, true nature and constitution of the joint venture that actually submitted the tender and performed on the OSPII Contract.

196.    As a result, the defendants have violated the Foreign Assistance Act of 1961, Section 640A(a), as amended, codified at 22 U.S.C. §2399b, and shall forfeit and refund any payment, compensation and advance received and shall pay to the United States for each such act, the sum of $2000 and double the amount of any damage which the United States may have sustained by reason thereof, or an amount equal to 50 per centum of any such payment, compensation and advance so received, whichever is greater together with costs of suit.

## Count VII
### (Unjust Enrichment - OSPII Contract)

197.   This is an action by the United States for damages to recover money paid to defendants MK and HAS on the OSPII Contract by which defendants MK and HAS have been unjustly enriched.

198.   Plaintiff restates and incorporates by reference the allegations set forth above in paragraphs 1–13 and paragraphs 75 - 112 as if set forth fully herein.

199.   Defendants MK and HAS and each of them have been unjustly enriched by virtue of the fraud and misrepresentations used to pre-qualify and be awarded the OSPII Contract in the amount equal to at least the U.S. dollar portion of the invoices paid by USAID for the OSPII Contract.

200.   Defendants MK and HAS' unjust enrichment has been to the detriment of plaintiff United States in that USAID approved the award of the OSPII Contract and paid the invoices submitted by or on behalf of defendants MK and HAS for a joint venture that was not eligible to receive USAID funds and which USAID would not have paid if it had known of the fraud and misrepresentations and illegal joint venture.

201.   Defendants MK and HAS and each of them are therefore jointly and severally liable to the Government for the amount of the unjust enrichment, in an amount to be determined at trial.

### Count VIII

**(Payment By Mistake - OSPII Contract)**

202.   This is an action by the United States to recover money paid to defendants MK and HAS under a mistake of fact on the OSPII Contract.

203.   Plaintiff restates and incorporates by reference the allegations set forth above in paragraphs 1-13 and paragraphs 75 - 112 as if set forth fully herein.

204.   Based upon the fraud of defendants MK and HAS in obtaining the OSPII Contract and subsequent false statements and false claims by those defendants for payment, plaintiff United States has paid to defendants MK and HAS $40,750,074.39 to date under the OSPII Contract.

205.   Plaintiff United States has paid these funds to defendants MK and HAS under the mistaken belief that the OSP II Contract was awarded and the work performed in accordance with the terms of the Contract and USAID regulations.

206.   Plaintiff's mistaken beliefs were material to the amount of the payments made by plaintiff in that the Government would have not paid if it had known about the unauthorized joint ventures.

207.   Because of these mistakes of fact, defendants have received money to which they are not entitled.

208.   By reasons of these payments, plaintiff is entitled to damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

-38-

WHEREFORE, plaintiff United States prays that judgment be entered in its favor against the defendants as follows:

A.    On Count I, judgment against all defendants for triple the damages sustained by plaintiff on the Aswan Cities Contract, the Luxor Contract, the Port Said Contract and the Ismailia Contract, a total still to be determined, plus civil penalties as are allowable by law in the amount of $5,000 to $10,000 per violation prior to September 29, 1999 and between $5,500 and $11,000 per violation on or after September 29, 1999, costs, and all other proper relief;

B.    On Count II, judgment against all defendants for forfeit and refund of payments received on the Aswan Cities Contract, the Luxor Contract, the Port Said Contract and the Ismailia Contract plus 50% of this amounts together with costs and interests.

C.    On Count III, judgment against all defendants in the amount of the unjust enrichment on the Aswan Cities Contract, the Luxor Contract, the Port Said Contract and the Ismailia Contract, a total still to be determined, pre-judgment interest, costs, and all other proper relief;

D.    On Count IV, judgment against all defendants for the amount the United States paid in mistake on the Aswan Cities Contract, the Luxor Contract, the Port Said Contract and the Ismailia Contract, pre-judgment interest, costs, and all other proper relief;

E.      On Count V, judgment against defendants MK and HAS for triple the damages sustained by plaintiff United States on the OSP II Contract, a total still to be determined, plus civil penalties as are allowable by law in the amount of $5,000 to $10,000 per violation prior to September 29, 1999 and between $5,500 and $11,000 per violation on or after September 29, 1999, costs, and all other proper relief;

F.      On Count VI, judgment against defendants MK and HAS for forfeit and refund of payments received on the OSPII Contract plus 50% of this amounts together with costs and interests;

G.      On Count VII, judgment against defendants MK and HAS for the amount by which defendants MK and HAS have been unjustly enriched by the Government's payment of their false claims on the OSPII Contract, a total still to be determined, pre-judgment interest, costs, and all other proper relief;

H.      On Count VIII, judgment against defendants MK and HAS for the amount the United States paid in mistake on the OSPII Contract, pre-judgment interest, costs, and all other proper relief;

I.      Equitable relief through an accounting of the proceeds of the fraud and the enforcement of a constructive trust and or equitable lien upon such proceeds, to the extent that the United States' legal remedies prove inadequate.

**PURSUANT TO RULE 38 OF THE FEDERAL RULES OF CIVIL PROCEDURE, PLAINTIFF, THE UNITED STATES OF AMERICA, DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

THOMAS E. MOSS
United States Attorney
District of Idaho

ALAN G. BURROW
Assistant United States Attorney

MICHAEL F. HERTZ
DODGE WELLS
CAROLYN G. MARK
Attorneys, Civil Division
U. S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel:  (202) 307-0256

November 5th, 2004

-41-

# COMPLAINT

## EXHIBIT LIST

| Exh. | Description | Ref. |
|------|-------------|------|
| A | Aswan two-party joint venture agreement | P. 9, ¶36 |
| B | Aswan three-party joint venture agreement | P. 9, ¶37 |
| C | Aswan Cities Contract – Schedule of Payments | P. 10, ¶44 |
| D | Luxor two-party joint venture agreement | P. 13, ¶58 |
| E | Luxor – letter dated June 4, 2001 | P. 14, ¶61 |
| F | Luxor three party joint venture agreement, unsigned | P.14, ¶61 |
| G | Luxor Contract – Schedule of Payments | P. 15, ¶68 |
| H | OSP II Contract joint venture agreement | P. 20, ¶94 |
| I | Ismailia Contract – Schedule of Payments | P. 26, ¶134 |
| J | Port Said Contract – Schedule of Payments | P. 28, ¶149 |

Exhibit A



CONTRACK INTERNATIONAL, INC.
NS

# JOINT VENTURE AGREEMENT

THIS AGREEMENT, made this 13th day of April, 1998 between MORRISON KNUDSEN INTERNATIONAL, INC. ("MK"), a Nevada corporation, P.O. Box 73, Boise, Idaho 83729, USA, and CONTRACK INTERNATIONAL, INC., ("CII"), a Washington, D.C. corporation, 1001 North 19th Street, Arlington, Virginia 22209. The entities shall jointly be referred to as "Joint Venturer", "Party" or "Parties".

## WITNESSETH:

WHEREAS, the Parties have entered into a Pre-Bid Memorandum of Understanding dated 5 January, 1997 for the purposes of their association and joint prequalification to be selected as contractor by the Arab Republic of Egypt, National Organization for Potable Water and Sanitary Drainage ("NOPWASD", the "Client") to bid on several contracts which are collectively known as the "Secondary Cities Project" ("Program") as described therein; and

WHEREAS, the Parties have submitted their prequalification information and have been jointly determined to be qualified to perform the contracts associated with the Program; and

WHEREAS, the Client has issued a Request for Proposal, dated January 5, 1998 for the ED/CM Aswan Cities Project (the "Project"); and

WHEREAS, the Parties have agreed to enter into a joint venture agreement (the "Agreement") for the purpose of submitting a joint bid (the "Bid") to the Client, for the Project; and

WHEREAS, the Parties desire to enter into this Agreement for the sole purpose of establishing a joint venture between them, preparing and submitting the Bid to the Client, and performance of the Project work in the event that the Parties are the successful bidders and are awarded the contract (the "Contract") for the performance thereof, and desire to fix and define between themselves their respective interests and liabilities in the performance of the work under said Contract in the event of an award:

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is agreed as follows:

1.    Creation of Joint Venture. The Parties associate themselves as Joint Venturers for the purpose of preparing and submitting the Bid and performing and completing the Contract for the Project if such Contract is awarded to the Joint Venture. The Joint Venture shall operate under the name Upper Egypt Constructors, a Joint Venture and all money, equipment, materials, supplies and other property acquired by the Joint Venture shall be held in such name. In the event the Joint Venture is not awarded the Contract for the Project, the Joint Venture shall automatically dissolve and terminate. In either event, each Party shall bear its own expenses in connection with the preparation and submittal of the Bid, except as may be mutually agreed otherwise by and between individual members of the Joint Venture.

**EXHIBIT A**

This Agreement shall come into force on the date first above mentioned and remain in until final acceptance of the works by or on behalf of the Client or until the date of approval final profit and loss account as referred to in Article 14 hereof, whichever is later, provided th Agreement shall remain in force thereafter until all rights and obligations which may still e against the Client or other third parties have terminated. However, this Agreement shall ter earlier if either the Bid cannot be agreed upon by the Parties or the Joint Venture is not aware Contract.

However, notwithstanding the above paragraph, this Agreement may be terminated by written consent of the Parties provided that all matters as between the Parties or with third have been finally settled.

2.    Extent of Joint Venture. It is specifically understood and agreed between the that this Joint Venture Agreement extends only to the preparation and submittal of the E performance of the Contract for the Project, together with any changes or additions thereto c work thereunder, but not to other or different work. The Parties agree that neither they nor their affiliated companies will participate in any bid to be submitted by a third party for this F except by prior written mutual agreement. It is the intent of the Parties that the Bid satisfactory and acceptable to each of the Parties. If any Party is unable to agree upon the Bid shall be submitted, and this Joint Venture shall automatically dissolve and terminate. event, each Party shall bear its own expenses to the termination date and each of the Parties free to submit their own individual or joint bids for such Project.

3.    Sponsoring Party. MK is designated as the Sponsor of the Joint Venture. Su the control of the Executive Committee of the Joint Venture, the Sponsor, and authorized of the Sponsor, shall (i) have management responsibility for the execution of the Contract; (ii) or employ such officers, employees or agents of the Joint Venture as it deems necess appropriate; (iii) bind the Joint Venture with third parties by contract, (iv) receive paym respect of the work on behalf of the Joint Venture, (v) receive an act upon instructions f Client, (vi) incur liabilities and settle disputes on behalf of the Joint Venture, and (vii) exerci powers as are necessary or convenient to fulfill the purposes of the Joint Venture.

4.    Executive Committee.

(a)    The Executive Committee shall determine general policies affecting t Venture and shall oversee the activities of the Project Manager ("Project Ma appointed by the Sponsoring Joint Venturer. Each Party shall be represented Executive Committee and shall have one vote, provided that no Party shall exercise at during any period of its default under the terms of this Agreement, as defined in p i i.

The Joint Venture shall execute the Project an autonomous entity under the contr Executive Committee with the day-to-day operations managed by the Project Manag Executive Committee shall:

1.    Develop policies affecting the overall performance of the Project.

CONTRACK INTERNATIONAL, INC.

2.   Determine working capital requirements in accordance with the provisions of paragraph 8.

3.   Establish bank accounts in accordance with the provisions of paragraph 9.

4.   Approve insurance policies, including limits and changes thereto.

5.   Approve bonds and any changes thereto.

6.   Approve employing lawyers on behalf of the Joint Venture in excess to any budgets approved in the Bid.

7.   Approve employing consultants on behalf of the Joint Venture in excess to any budgets approved in the Bid.

8.   Approve settlement of claims against the Joint Venture, including claims by subcontractors and suppliers in excess of $25,000.

9.   Approve commencement and conduct of defense or settlement of claims or litigation involving the Joint Venture in excess of $50,000.

10.  Approve subcontracts, purchase orders, sale of assets and lease agreements in excess of $100,000.

11.  Approve any collective labor agreements or settlement of disputes resulting therefrom.

12.  Approve any changes or modifications to the Contract in excess of $100,000.

13.  Approve any subcontract or binding agreement between any of the Parties and the Joint Venture.

14.  Approve any changes to the project budget included in the Bid.

15.  Approve all matters of a political, environmental or public relations nature, including the designation of an official spokesperson for the Joint Venture.

16.  Approve the auditors for the Joint Venture.

17.  Approve billing rates of personnel seconded to the project by the Parties and the billing rates for any Party's home office personnel assisting the Project.

18.  Approval of Project Manager appointed by Sponsoring Joint Venturer.

The Project Manager shall have authority to manage the operations of the Project and make all decisions not reserved to the Executive Committee above and take all other acts required to complete the Project, except that the Executive Committee may in, from time to time, add to or delete from the above listed activities.

  (b)  Each party shall appoint one representative to the Executive Committee and one alternate who shall have authority to act in the representative's absence. Either Party may change its representative or alternate by giving written notice of his successor to the other. Mr. Patrick L. Pettiette is designated as the initial representative of MK and Mr. Larry Voorhees is designated as the initial alternate representative of MK; Mr. Nassef Sawaris is designated as the initial representative of CII and Mr. Osama Bishai is designated as the initial alternate representative of CII.

  (c)  The Executive Committee shall be chaired by the representative of the Sponsor. The chairman shall call meetings of the Committee by giving adequate notice to the Parties when it is deemed necessary or whenever requested to do so by any of the Parties. A quorum shall be constituted when all the representative or their alternates are present at an Executive Committee Meeting and no Party shall exercise any votes during any period it is in default under the term of this Agreement as defined in Article 11.

The Executive Committee shall endeavor to act by the unanimous vote of the representatives. In the event that the Executive Committee is unable unanimously to agree on an action, the dispute shall be submitted in writing to the Senior Executive Officer of the respective Joint Venture party who shall attempt to resolve the dispute within ten days of receipt. In the event that a resolution is not obtained in this manner, the Sponsoring Party may make a decision based on the best information available where immediate action is required to (i) prevent damage to the Project; (ii) prevent a breach of contract between the Joint Venture and any other party; (iii) prevent the unnecessary incurrence of costs on the Project; or (iv) prevent delay in the completion date of the Project. However, the exercise of such decision-making authority by the Sponsor shall not prohibit the other representatives from submitting such matter to arbitration or a court of competent jurisdiction as provided in paragraph 16. The Sponsor's ruling shall remain in force until such time any Executive Committee shall rescind it or until the issue has been settled in accordance with Arbitration or Court proceedings. If any Party is in default under this Agreement, then during the time of such default, its representative shall not vote upon any issue, and such representative shall not be included in the computation of eligible votes. All actions taken by the Executive Committee shall be confirmed within one week by the Chairman in a written report to the other Executive Committee members.

  5.  Liability, Share of Profits and Losses; Contributions. The Parties shall be jointly and severally liable to the Client for the performance of the Contract .

The interests of the Parties in and to any profits and assets derived from the performance of the Contract, and in and to any property acquired by this Joint Venture in connection with the work to be performed thereunder, and in and to all contributions required, all moneys received and all costs incurred in the performance of the Contract shall be those percentages set opposite their respective names (the "Sharing Ratio") as follows

| | MK | 60% |
| | CII | 40% |

In the event any Party independently causes direct loss, damage or liability whatsoever to another Party or to any third party, such Party shall hold harmless, indemnify and defend the other Party against such loss, damage or liability incurred.  Neither Party shall claim from the other any indirect, consequential, punitive, penalty or liquidated loss, damage or liability save those (if any) which have been adjudged to have been suffered by the Client or a third party as a result of a Party's independent acts or omissions.

Each of the Parties hereby indemnifies the other against any loss or liability, which does not arise by reason of the other Party's negligence or intentional misconduct, sustained in the performance of the Contract which exceeds the amount computed under the stated percentages.  Such indemnified amount shall be due and payable within 15 Business Days after written notice thereof and demand for payment.  A "Business Day" shall mean any day other than Saturday, Sunday or any legal holiday observed in the Arab Republic of Egypt.

6.    Surety Bonds; Financial Obligations.  The Parties have agreed that MK shall arrange for the tender and performance bonds as may be required by the Bid and Contract; however, any costs incurred by MK in securing the bonds shall be charged to the Joint Venture.  Each of the Parties agrees to execute all applications and indemnity agreements required by the sureties upon any bond or bonds required in connection with the said Bid and Contract.  All financial obligations assumed by the Joint Venture in connection with the performance of the Contract, all liabilities assumed by or charged to the Joint Venture as contractor, guarantor or indemnitor in connection with any surety bond or other bonds which may be given or executed in connection with the Bid or Contract, and all other obligations and liabilities of any kind or character which are assumed or undertaken by the Joint Venture in connection with and for the benefit of the performance of the Bid or Contract shall be shared by the Parties proportionately and in accordance with their respective interests as set forth in paragraph 4 hereof, except as set forth in paragraph 1 hereof.

Except as expressly provided in this Agreement, or as otherwise agreed in writing by such Party, no Party shall have any liability or obligation to any third party (including, without limitation, any subcontractor) by reason of any obligation of or performance by the Joint Venture under the Contract or any other matter pertaining to the Joint Venture.

7.    Joint Venture Equipment.  Equipment necessary for the performance of the Contract may be contributed by one or more of the Parties.  In the event equipment is contributed by a Party, the following will apply:

(a)    The Executive Committee will determine the fair market value for the equipment.  In the event the Executive Committee cannot agree on a fair market value, the value shall be established by an independent equipment appraiser selected by the Executive Committee and hired at the expense of the Joint Venture.

(b)     The Executive Committee will thereafter determine whether the equipme[nt]     such
be purchased by the Joint Venture at the established fair market value or rented by the     Cap
Venture.

(c)     If the equipment is to be rented from a Party, the Joint Venture will ent[er]     Join
a rental agreement with the owning Party, which agreement will set forth rental rates, [t]     inter
of rental, responsibility for major and minor repairs and other terms typically foun[d]     Agr
standard rental agreement.     Con

(d)     In the event the equipment is purchased by the Joint Venture, the
contributing the equipment will have first right of refusal to repurchase the equipmen[t]     othe
disposal of the equipment by the Joint Venture.     the J
such
Shar
8.     Working Capital.     Call
exce
(a)     All necessary working capital, when and as required for the performan[ce]     time
prosecution of the Contract, as determined by the Executive Committee, shall be fun[ded]     such
by the Parties proportionately in accordance with their respective interests as set f[h]     Capi
paragraph 5 hereof. Each of the Parties recognizes that the failure of any Party to con[tribute]     in th
its designated share of working capital will have serious adverse consequences for th[e]     Capi
Venture and imposes an unfair burden upon the other Parties. As to such working c[apital]     have
contribution, each of the Parties waives any rights of set-off it might otherwise posse[ss]     Part
agrees to make the working capital contributions without set-off or deduction of an[y]     Con[t]
If any Party borrows funds to meet its obligation hereunder, such borrowing shall be t[he]
and separate obligation of the Party and shall not be the debt or obligation of th[e]
Venture. None of the Parties, nor their representatives, shall have the power to pled[ge]     9.
credit of any other Party, nor to pledge the joint credit of all the Parties, except by una[mous]     [f]or its accou[nt]
consent of the Parties.     [p]erformanc[e]
[th]e establish[ed]

(b)     The Executive Committee shall determine the working capital needs [dr]awn on s[a]
Joint Venture and, to the extent such needs cannot reasonably be met from cash on h[a]me by the
Project revenues, shall give written notice (a "Capital Call") to the Parties of the ame[unt] such ban[k]
cash or other capital that must be contributed by the Parties (a "Capital Contribution[")] [w]hich may b[e]
[E]xecutive C[o]

(c)     Upon receipt of a Capital Call, each Party shall be obligated to make a [re]turned to a
Contribution as specified in the notice given pursuant to paragraph 8(b) or, if no such [f] the Projec[t]
is specified, a period of ten (10) days after the giving of the notice of the Capital Ca[ll]
"Capital Call Period") to make a Capital Contribution to the capital of the Joint Ven[ture]     10.
cash or other capital specified in the Capital Call in an amount determined by appl[y]i[ng] [a]ld such boo[k]
Party's Sharing Ratio (as adjusted as of the time of the Capital Call) to the total am[ount] [v]enture sta[ff]
cash or other capital specified in the Capital Call.     [th]e work sha[ll]

(d)     If any Party fails to make any required payment under this paragraph [     11.
to expiration of the Capital Call Period, the other Party may advance (a "Cap[ital] [d]efault afte[r]
Advance") to the Joint Venture any part or all of such required payment. A Capit[al] [a]irs, insur[e]
Advance shall be deemed to be an additional Capital Contribution by the a[d]vancing P[arty] [u]nder Chapt[er]

such Party's Sharing Ratio shall be adjusted accordingly as of the time of the making of the Capital Call Advance, except as provided in paragraph 8(f) below.

(d)     Capital Contributions shall be expended in furtherance of the business of the Joint Venture. All costs and expenses of the Joint Venture shall be paid from its funds. No interest shall be paid on Capital Contributions. Except as expressly provided in this Agreement, no Party shall have any personal liability for the repayment of any Capital Contribution made by another Party.

(f)     To the extent either Party pays any liability or obligation to any third Party other than the Joint Venture arising out of or in any way connected with this Agreement or the Joint Venture, except for any liabilities or obligations that are the subject of paragraph 6, such payment shall be treated for all purposes of this Agreement, including adjustments of Sharing Ratios, as if such payment were a Capital Contribution made in response to a Capital Call pursuant to paragraph 8(c) of this Agreement; and to the extent any such payment exceeds the amount determined by applying such Party's Sharing Ratio, as adjusted as of the time immediately prior to such payment to the total amount of such liability or obligation, such excess shall be treated, for all purposes of this Agreement, as if such excess were a Capital Call Advance within the meaning of paragraph 8(d) of this Agreement; provided that in the event a portion of a payment made pursuant to this paragraph 8(f) is deemed to be a Capital Call Advance, the Party on whose behalf such Capital Call Advance was made shall have ten (10) days from the making of such advance to reimburse such advance to the paying Party, in which case such reimbursement shall likewise be deemed to be a Capital Contribution for all purposes of this Agreement, including adjustment of Sharing Ratios.

9.     Bank Accounts. All funds advanced by the Parties or borrowed by the Joint Venture and placed in escrow and all progress and final payments or other revenue received as a result of the performance of the Contract shall be deposited to the account of the Joint Venture in an account to be established at such bank or banks as the Executive Committee may designate. Checks may be drawn on said account or accounts by signatures of such persons as may be designated from time to time by the Executive Committee. The Joint Venture may also maintain payroll or other accounts at such bank or at such branch or at such other bank as the Executive Committee may designate, which may be drawn upon by the signature or signatures of such persons as may be designated by the Executive Committee. No part of any advances deposited in said bank account or accounts shall be distributed to any of the Parties, and no distribution of profits shall be made, prior to the completion of the Project, except as may be mutually agreed upon by the Parties in writing.

10.     Financial Affairs. Adequate books of account shall be maintained by the Joint Venture and such books of account may be examined by any of the Parties at all reasonable times. The Joint Venture staff shall make reports of the financial condition of the Joint Venture and the progress of the work shall be made to the Executive Committee no less frequently than quarterly.

11.     Default and Insolvency. If a Party shall be in default hereunder, and fail to cure such default after written notice or demand, as the case may be, cease to operate or terminate its business or institute an insolvency procedure under applicable law, permit the entry of any order for relief under Chapter 7 of the Bankruptcy Code, or fail to cure a default hereunder after entry of an order

for relief under Chapter 11 of the Bankruptcy Code, (such Party being hereinafter referred to "Defaulting or Insolvent Party"), then from and after such date:

(a) all acts, consents and decisions with respect to the performance of the Con or the management of the Joint Venture shall thereafter be taken solely by the remaining Par Parties without considering the Defaulting or Insolvent Party.

(b) the participation of the Insolvent Party in the profits of the Joint Venture sha limited to that proportion which the Defaulting or Insolvent Party's contributions to the working of the Joint Venture bear to the total of such contributions as same may be modified by and su to the provisions of paragraph 8(b) hereof, but the Defaulting or Insolvent Party shall be cha with, and shall be liable for, any and all losses that may be suffered by the Joint Venture under Contract, or any additions or supplements thereto or modifications thereof, to the full extent of Defaulting or Insolvent Party's percentage of participation, set forth in paragraph 5 hereof.

12.   Project Costs.

(a)   All costs and charges as proposed by the Parties and agreed by the Executive Committee shall be considered costs of the Project chargeable in the proportions of the participating interest of each Party.

(b)   A Sponsor management fee of three fourths of one percent (1.00%) of total Pro revenue shall be paid to the Sponsor.

(c)   Travel/subsistence expenses of Board Representatives or other alternates in res of Executive Committee Meetings shall be borne by each Party unless agreed upon other

(d)   No Party without the consent of the other shall make any charges against the Venture for any ordinary home office overhead expenses or for time which may be expe by its officers or employees unless they are employed by the Joint Venture in performi Contract.

13.   Assignment.   No Party shall assign its interest in the Joint Venture without obtaining the consent of the other Parties which consent shall not be unreasonably withheld.

14.   Distribution of Remaining Funds.   Upon the termination of the Joint Venture and providing for or paying all of its obligations, including those to any of the Parties, any p remaining shall be distributed and divided between the Parties in accordance with their perce interests in the Joint Venture. All other assets of the Joint Venture shall be distributed on the basis.

15.   Improper Payments.   The Parties represent and warrant that, in connection wi business to be conducted under this Agreement, no payment has been or will be made by them any of their officers, employees, agents, subsidiary or affiliated companies to any officer, offic employee (or to any agent or other person acting on behalf of such a person) of any nation or na company.

ter referred to: This Agreement shall terminate automatically and without notice upon a Party learning of any violation of this clause and that Party shall have no obligation to pay any amount otherwise owing pursuant to this Agreement.

ce of the Comm
emaining Party

16.    Settlement of Disputes.

        (a)    All disputes arising in connection with this Agreement shall first be referred to senior corporate management of the Parties for settlement.

t Venture shall
the working fi
ed by and subje
shall be charg
enture under s
full extent of t
5 hereof.

        (b)    In case agreement cannot be reached as per paragraph 16(a), the matter shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules or a court of competent jurisdiction.  The locale of the arbitration shall be New York or such other place as may be mutually agreed by the Parties.

Executive
le  in  the

        (c)    Judgment upon award under arbitration may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order for enforcement as the case may be.  Arbitration and/or attorney fees shall be assessed against the Party against whom the award is determined, or against both Parties if the determination is against both.  The arbitrator/court shall be authorized to award either Party a sum to compensate the Party for the time and expense of the arbitration/suit if the arbitration/suit was demanded without reasonable cause, thereby assessing the costs against the Party instigating arbitration/suit.

) of total Proj

ernates in resp
upon otherw

against the f
may be expen
n performing

17.    Confidential Information.  The Parties agree they will not disclose, either during the term of this Agreement or at any time thereafter, to any person, firm or corporation any information concerning the business or affairs of the other Parties, or any subsidiary, affiliate or partner of the other Parties ("Confidential Information") which a Party may have acquired during the term of this Agreement for his own benefit or for the detriment or intended probable detriment of the other Parties.  The provisions of this paragraph shall apply during the term of this Agreement and shall survive termination of this Agreement.

ure without
withheld.

Venture and a
ries, any pre
their percent
ated on the se

18.    Conflicts.  In the event that any conflicts shall hereinafter arise between the terms and provisions of this Agreement and the terms and provisions of the Contract, Pre-Bid Agreement or Memorandum of Understanding between the Parties, as the same pertains to the respective rights and obligations of the Joint Venturers hereto as between themselves, the provisions of this Agreement shall control as between the Parties hereto.

nection with
de by them or
fficer, officia
nation or nati

19.    Public Statements.  The Joint Venture may make public announcements regarding the Joint Venture in the normal course of business provided that no such announcement shall mention the name of a Party without the Party's written consent.  Neither Party shall make any public announcement or public disclosure with regard to this Agreement, the Joint Venture or, in the case of a Party, the other Party, the Contract or the activities thereunder, including Confidential Information and non-confidential Information, without the prior written consent of the other Party as to the content and timing of such announcement or disclosure, which consent shall not be

unreasonably withheld; provided, however, that nothing shall prevent the Joint Venture or a:      IN WITN
from making such an announcement or disclosure which is required by applicable law, regula: love written.
stock exchange rule.

{ORRISON KN

20.   Notices. All notices required or permitted by this Agreement shall be in writ: JC.
shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be eff:
when received or, if mailed, on the date set forth on the receipt of registered or certified' 
addressed to the other Party as follows:

Ex<c_ k
5

Morrison Knudsen International, Inc.
P. O. Box 73
Boise, Idaho 83729
Attention:   Mr. Patrick L. Pettiette
                                                        (Name)

              Executive Vice President
                                                        (Title)


Contrack International, Inc.
1001 North 19th Street
Arlington, Virginia 22209
Attention:   Mr. Karim Camel-Toueg
                                                        (Name)

                                                        (Title)


21.   Entire Agreement. This Agreement embodies the entire understanding and agre:
among the Parties concerning the Joint Venture and supersedes any and all prior negoti:
understandings or agreements in regard thereto.

22.   Severability. If any provision of this Agreement or the application hereof t:
person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, n:
the remainder of this Agreement nor the application of such provision to any other pers:
circumstances shall be affected thereby, but rather the same shall be enforced to the greatest e
permitted by applicable law.

23.   Miscellaneous. This Agreement shall be interpreted under the laws of the :
governing the Contract with the Client, and shall not be amended, modified or revoked exce
writing signed by all of the Parties, and shall inure to the benefit of and be binding upon the Pa
their successors, trustees, assigns, receivers and legal representatives, but shall not inure to the b
of any other person, firm or corporation.

ture or a Pa
', regulatio above written.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

in writing
all be effec
certified

MORRISON KNUDSEN INTERNATIONAL, INC.

By: _____

Its _Exec. Vice President_

CONTRACK INTERNATIONAL, INC.

By: _____

Its _EGYPT OPERATION MGR_

nd agreem
negotiatic

hereof to r
eable, neit
er person
eatest exu

of the St
ed excep
n the Part
to the ben

Exhibit B

# JOINT VENTURE AGREEMENT

THIS AGREEMENT, made this 13th day of April, 1998 between MORRISON KNUDSEN INTERNATIONAL, INC. ("MK"), a Nevada corporation, P.O. Box 73, Boise, Idaho 83729, USA, CONTRACK INTERNATIONAL, INC., ("CII"), a Washington, D.C. corporation, 1001 North 19th Street, Arlington, Virginia 22209, and MISR SONS DEVELOPMENT S.A.E., HASSAN ALLAM SONS ("HAS") an Egyptian corporation, 15, Hassan Allam Street, Heliopolis, Cairo, Egypt. The entities shall jointly be referred to as "Joint Venturer", "Party" or "Parties".

## WITNESSETH:

WHEREAS, the Parties have entered into a Pre-Bid Memorandum of Understanding dated 5 January, 1997 for the purposes of their association and joint prequalification to be selected as contractor by the Arab Republic of Egypt, National Organization for Potable Water and Sanitary Drainage ("NOPWASD", the "Client") to bid on several contracts which are collectively known as the "Secondary Cities Project" ("Program") as described therein; and

WHEREAS, the Parties have submitted their prequalification information and have been jointly determined to be qualified to perform the contracts associated with the Program; and

WHEREAS, the Client has issued a Request for Proposal, dated January 5, 1998 for the ED/CM Aswan Cities Project (the "Project"); and

WHEREAS, the Parties have agreed to enter into a joint venture agreement (the "Agreement") for the purpose of submitting a joint bid (the "Bid") to the Client, for the Project; and

WHEREAS, the Parties desire to enter into this Agreement for the sole purpose of establishing a joint venture between them, preparing and submitting the Bid to the Client, and performance of the Project work in the event that the Parties are the successful bidders and are awarded the contract (the "Contract") for the performance thereof, and desire to fix and define between themselves their respective interests and liabilities in the performance of the work under said Contract in the event of an award;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is agreed as follows:

1.    Creation of Joint Venture. The Parties associate themselves as Joint Venturers for the purpose of preparing and submitting the Bid and performing and completing the Contract for the Project if such Contract is awarded to the Joint Venture. The Joint Venture shall operate under the name Upper Egypt Constructors, a Joint Venture and all money, equipment, materials, supplies and other property acquired by the Joint Venture shall be held in such name. In the event the Joint Venture is not awarded the Contract for the Project, the Joint Venture shall automatically dissolve and terminate. In either event, each Party shall bear its own expenses in connection with the

C:\docs\contract\jvblank1.new

## EXHIBIT B

preparation and submittal of the Bid, except as may be mutually agreed otherwise by and between individual members of the Joint Venture.

This Agreement shall come into force on the date first above mentioned and remain in force until final acceptance of the works by or on behalf of the Client or until the date of approval of the final profit and loss account as referred to in Article 14 hereof, whichever is later, provided that this Agreement shall remain in force thereafter until all rights and obligations which may still exist as against the Client or other third parties have terminated. However, this Agreement shall terminate earlier if either the Bid cannot be agreed upon by the Parties or the Joint Venture is not awarded the Contract.

However, notwithstanding the above paragraph, this Agreement may be terminated by mutual written consent of the Parties provided that all matters as between the Parties or with third parties have been finally settled.

2.     Extent of Joint Venture. It is specifically understood and agreed between the Parties that this Joint Venture Agreement extends only to the preparation and submittal of the Bid and performance of the Contract for the Project, together with any changes or additions thereto or extra work thereunder, but not to other or different work. The Parties agree that neither they nor any of their affiliated companies will participate in any bid to be submitted by a third party for this Project, except by prior written mutual agreement. It is the intent of the Parties that the Bid shall be satisfactory and acceptable to each of the Parties. If any Party is unable to agree upon the Bid, no Bid shall be submitted, and this Joint Venture shall automatically dissolve and terminate. In such event, each Party shall bear its own expenses to the termination date and each of the Parties shall be free to submit their own individual or joint bids for such Project.

3.     Sponsoring Party. MK is designated as the Sponsor of the Joint Venture. Subject to the control of the Executive Committee of the Joint Venture, the Sponsor, and authorized officers of the Sponsor, shall (i) have management responsibility for the execution of the Contract; (ii) appoint or employ such officers, employees or agents of the Joint Venture as it deems necessary or appropriate; (iii) bind the Joint Venture with third parties by contract,  (iv) receive payments in respect of the work on behalf of the Joint Venture, (v) receive an act upon instructions from the Client, (vi) incur liabilities and settle disputes on behalf of the Joint Venture, and (vii) exercise such powers as are necessary or convenient to fulfill the purposes of the Joint Venture.

4.     Executive Committee.

(a)     The Executive Committee shall determine general policies affecting the Joint Venture and shall oversee the activities of the Project Manager ("Project Manager") appointed by the Sponsoring Joint Venturer. Each Party shall be represented on the Executive Committee and shall have one vote, provided that no Party shall exercise any votes during any period of its default under the terms of this Agreement, as defined in paragraph 11.

The Joint Venture shall execute the Project an autonomous entity under the control of the Executive Committee with the day-to-day operations managed by the Project Manager.  The Executive Committee shall:

1.   Develop policies affecting the overall performance of the Project.

2.   Determine working capital requirements in accordance with the provisions of paragraph 8.

3.   Establish bank accounts in accordance with the provisions of paragraph 9.

4.   Approve insurance policies, including limits and changes thereto.

5.   Approve bonds and any changes thereto.

6.   Approve employing lawyers on behalf of the Joint Venture in excess to any budgets approved in the Bid.

7.   Approve employing consultants on behalf of the Joint Venture in excess to any budgets approved in the Bid.

8.   Approve settlement of claims against the Joint Venture, including claims by subcontractors and suppliers in excess of $25,000.

9.   Approve commencement and conduct of defense or settlement of claims or litigation involving the Joint Venture in excess of $50,000.

10.   Approve subcontracts, purchase orders, sale of assets and lease agreements in excess of $100,000.

11.   Approve any collective labor agreements or settlement of disputes resulting therefrom.

12.   Approve any changes or modifications to the Contract in excess of $100,000.

13.   Approve any subcontract or binding agreement between any of the Parties and the Joint Venture.

14.   Approve any changes to the project budget included in the Bid.

15.   Approve all matters of a political, environmental or public relations nature, including the designation of an official spokesperson for the Joint Venture.

16.   Approve the auditors for the Joint Venture.

17.   Approve billing rates of personnel seconded to the project by the Parties and the billing rates for any Party's home office personnel assisting the Project.

18.   Approval of Project Manager appointed by Sponsoring Joint Venturer.

The Project Manager shall have authority to manage the operations of the Project and to make all decisions not reserved to the Executive Committee above and take all other actions required to complete the Project, except that the Executive Committee may in, from time to time, add to or delete from the above listed activities.

(b)   Each party shall appoint one representative to the Executive Committee and one alternate who shall have authority to act in the representative's absence. Either Party may change its representative or alternate by giving written notice of his successor to the other. Mr. Patrick L. Pettiette is designated as the initial representative of MK and Mr. James Voorhees is designated as the initial alternate representative of MK; Mr. Nassef Sawaris is designated as the initial representative of CII and Mr. Osama Bishai is designated as the initial alternate representative of CII; Mr. Kamal Allam is designated as the initial representative of HAS and Mr. Magdi Allam is designated as the intitial alternate representative of HAS.

(c)   The Executive Committee shall be chaired by the representative of the Sponsor. The chairman shall call meetings of the Committee by giving adequate notice to the Parties when it is deemed necessary or whenever requested to do so by any of the Parties. A quorum shall be constituted when all the representative or their alternates are present at the Executive Committee Meeting and no Party shall exercise any votes during any period of its default under the term of this Agreement as defined in Article 11.

The Executive Committee shall endeavor to act by the unanimous vote of the representatives. In the event that the Executive Committee is unable unanimously to agree on an action, the dispute shall be submitted in writing to the Senior Executive Officer of the respective Joint Venture partners who shall attempt to resolve the dispute within ten days of receipt. In the event that a resolution is not obtained in this manner, the Sponsoring Party may make a decision based on the best information available where immediate action is required to (i) prevent damage to the Project; (ii) prevent a breach of contract between the Joint Venture and any other party; (iii) prevent the unnecessary incurrence of costs on the Project; or (iv) prevent delay in the completion date of the Project. However, the exercise of such decision-making authority by the Sponsor shall not prohibit the other representatives from submitting such matter to arbitration or a court of competent jurisdiction as provided in paragraph 16. The Sponsor's ruling shall remain in force until such time any future Executive Committee shall rescind it or until the issue has been settled in accordance with Arbitration or Court proceedings. If any Party is in default under this Agreement, then during the time of such default, its representative shall not vote upon any issue, and such representative shall not be included in the computation of eligible votes. All actions taken by the Executive Committee shall be confirmed within one week by the Chairman in a written report to the other Executive Committee members..

5.    Liability, Share of Profits and Losses; Contributions.  The Parties shall be jointly and severally liable to the Client for the performance of the Contract .

The interests of the Parties in and to any profits and assets derived from the performance of the Contract, and in and to any property acquired by this Joint Venture in connection with the work to be performed thereunder, and in and to all contributions required, all moneys received and losses incurred in the performance of the Contract shall be those percentages set opposite their respective names (the "Sharing Ratio") as follows:

| | |
|---|---|
| MK | 45% |
| CII | 30% |
| HAS | 25% |

In the event any Party independently causes direct loss, damage or liability whatsoever to another Party or to any third party, such Party shall hold harmless, indemnify and defend the other Party against such loss, damage or liability incurred.  Neither Party shall claim from the other any indirect, consequential, punitive, penalty or liquidated loss, damage or liability save those (if any) which have been adjudged to have been suffered by the Client or a third party as a result of a Party's independent acts or omissions.

Each of the Parties hereby indemnifies the other against any loss or liability, which does not arise by reason of the other Party's negligence or intentional misconduct, sustained in the performance of the Contract which exceeds the amount computed under the stated percentages.  Such indemnified amount shall be due and payable within 15 Business Days after written notice thereof and demand for payment.  A "Business Day" shall mean any day other than Saturday, Sunday or any legal holiday observed in the Arab Republic of Egypt.

6.    Surety Bonds; Financial Obligations.  The Parties have agreed that MK shall arrange for the tender and performance bonds as may be required by the Bid and Contract; however, any costs incurred by MK in securing the bonds shall be charged to the Joint Venture.  Each of the Parties agrees to execute all applications and indemnity agreements required by the sureties upon any bond or bonds required in connection with the said Bid and Contract.  All financial obligations assumed by the Joint Venture in connection with the performance of the Contract, all liabilities assumed by or charged to the Joint Venture as contractor, guarantor or indemnitor in connection with any surety bond or other bonds which may be given or executed in connection with the Bid or Contract, and all other obligations and liabilities of any kind or character which are assumed or undertaken by the Joint Venture in connection with and for the benefit of the performance of the Bid or Contract shall be shared by the Parties proportionately and in accordance with their respective interests as set forth in paragraph 4 hereof, except as set forth in paragraph 1 hereof.

Except as expressly provided in this Agreement, or as otherwise agreed in writing by such Party, no Party shall have any liability or obligation to any third party (including, without limitation, any subcontractor) by reason of any obligation of or performance by the Joint Venture under the Contract or any other matter pertaining to the Joint Venture.

C:\docs\contract\jvblank1.new

7.     Joint Venture Equipment.  Equipment necessary for the performance of the Contract may be contributed by one or more of the Parties.  In the event equipment is contributed by a Party, the following will apply:

(a)     The Executive Committee will determine the fair market value for the equipment.  In the event the Executive Committee cannot agree on a fair market value, the value shall be established by an independent equipment appraiser selected by the Executive Committee and hired at the expense of the Joint Venture.

(b)     The Executive Committee will thereafter determine whether the equipment will be purchased by the Joint Venture at the established fair market value or rented by the Joint Venture.

(c)     If the equipment is to be rented from a Party, the Joint Venture will enter into a rental agreement with the owning Party, which agreement will set forth rental rates, length of rental, responsibility for major and minor repairs and other terms typically found in a standard rental agreement.

(d)     In the event the equipment is purchased by the Joint Venture, the Party contributing the equipment will have first right of refusal to repurchase the equipment upon disposal of the equipment by the Joint Venture.

8.     Working Capital.

(a)     All necessary working capital, when and as required for the performance and prosecution of the Contract, as determined by the Executive Committee, shall be furnished by the Parties proportionately in accordance with their respective interests as set forth in paragraph 5 hereof.  Each of the Parties recognizes that the failure of any Party to contribute its designated share of working capital will have serious adverse consequences for the Joint Venture and imposes an unfair burden upon the other Parties.  As to such working capital contribution, each of the Parties waives any rights of set-off it might otherwise possess, and agrees to make the working capital contributions without set-off or deduction of any type.  If any Party borrows funds to meet its obligation hereunder, such borrowing shall be the sole and separate obligation of the Party and shall not be the debt or obligation of the Joint Venture.  None of the Parties, nor their representatives, shall have the power to pledge the credit of any other Party, nor to pledge the joint credit of all the Parties, except by unanimous consent of the Parties.

(b)     The Executive Committee shall determine the working capital needs of the Joint Venture and, to the extent such needs cannot reasonably be met from cash on hand or Project revenues, shall give written notice (a "Capital Call") to the Parties of the amount of cash or other capital that must be contributed by the Parties (a "Capital Contribution").

(c)     Upon receipt of a Capital Call, each Party shall be obligated to make a Capital Contribution as specified in the notice given pursuant to paragraph 8(b) or, if no such period is specified, a period of ten (10) days after the giving of the notice of the Capital Call (the

"Capital Call Period") to make a Capital Contribution to the capital of the Joint Venture of cash or other capital specified in the Capital Call in an amount determined by applying the Party's Sharing Ratio (as adjusted as of the time of the Capital Call) to the total amount of cash or other capital specified in the Capital Call.

(d)     If any Party fails to make any required payment under this paragraph 8 prior to expiration of the Capital Call Period, the other Party may advance (a "Capital Call Advance") to the Joint Venture any part or all of such required payment.  A Capital Call Advance shall be deemed to be an additional Capital Contribution by the advancing Party, and such Party's Sharing Ratio shall be adjusted accordingly as of the time of the making of the Capital Call Advance, except as provided in paragraph 8(f) below.

(e)     Capital Contributions shall be expended in furtherance of the business of the Joint Venture.  All costs and expenses of the Joint Venture shall be paid from its funds.  No interest shall be paid on Capital Contributions.  Except as expressly provided in this Agreement, no Party shall have any personal liability for the repayment of any Capital Contribution made by another Party.

(f)     To the extent either Party pays any liability or obligation to any third Party other than the Joint Venture arising out of or in any way connected with this Agreement or the Joint Venture, except for any liabilities or obligations that are the subject of paragraph 6, such payment shall be treated for all purposes of this Agreement, including adjustments of Sharing Ratios, as if such payment were a Capital Contribution made in response to a Capital Call pursuant to paragraph 8(c) of this Agreement; and to the extent any such payment exceeds the amount determined by applying such Party's Sharing Ratio, as adjusted as of the time immediately prior to such payment to the total amount of such liability or obligation, such excess shall be treated, for all purposes of this Agreement, as if such excess were a Capital Call Advance within the meaning of paragraph 8(d) of this Agreement; provided that in the event a portion of a payment made pursuant to this paragraph 8(f) is deemed to be a Capital Call Advance, the Party on whose behalf such Capital Call Advance was made shall have ten (10) days from the making of such advance to reimburse such advance to the paying Party, in which case such reimbursement shall likewise be deemed to be a Capital Contribution for all purposes of this Agreement, including adjustment of Sharing Ratios.

9.     Bank Accounts.  All funds advanced by the Parties or borrowed by the Joint Venture for its account and all progress and final payments or other revenue received as a result of the performance of the Contract shall be deposited to the account of the Joint Venture in an account to be established at such bank or banks as the Executive Committee may designate.  Checks may be drawn on said account or accounts by signatures of such persons as may be designated from time to time by the Executive Committee.  The Joint Venture may also maintain payroll or other accounts at such bank or at such branch or at such other bank as the Executive Committee may designate, which may be drawn upon by the signature or signatures of such persons as may be designated by the Executive Committee.  No part of any advances deposited in said bank account or accounts shall be returned to any of the Parties; and no distribution of profits shall be made, prior to the completion of the Project, except as may be mutually agreed upon by the Parties in writing.

BLANK JOINT VENTURE AGREEMENT - Page 7                                    C:\docs\contract\jvblank1.new

10.   Financial Affairs. Adequate books of account shall be maintained by the Joint Venture and such books of account may be examined by any of the Parties at all reasonable times. The Joint Venture staff shall make reports of the financial condition of the Joint Venture and the progress of the work shall be made to the Executive Committee no less frequently than quarterly.

11.   Default and Insolvency. If a Party shall be in default hereunder, and fail to cure such default after written notice or demand, as the case may be, cease to operate or terminate its business affairs, institute an insolvency procedure under applicable law, permit the entry of any order for relief under Chapter 7 of the Bankruptcy Code, or fail to cure a default hereunder after entry of an order for relief under Chapter 11 of the Bankruptcy Code, (such Party being hereinafter referred to as "Defaulting or Insolvent Party"), then from and after such date:

(a)   all acts, consents and decisions with respect to the performance of the Contract or the management of the Joint Venture shall thereafter be taken solely by the remaining Party or Parties without considering the Defaulting or Insolvent Party.

(b)   the participation of the Insolvent Party in the profits of the Joint Venture shall be limited to that proportion which the Defaulting or Insolvent Party's contributions to the working fund of the Joint Venture bear to the total of such contributions as same may be modified by and subject to the provisions of paragraph 8(b) hereof, but the Defaulting or Insolvent Party shall be charged with, and shall be liable for, any and all losses that may be suffered by the Joint Venture under said Contract, or any additions or supplements thereto or modifications thereof, to the full extent of the Defaulting or Insolvent Party's percentage of participation, set forth in paragraph 5 hereof.

12.   Project Costs.

(a)   All costs and charges as proposed by the Parties and agreed by the Executive Committee shall be considered costs of the Project chargeable in the proportions of the participating interest of each Party.

(b)   A Sponsor management fee of ~~three-fourths~~ *one Half* of one percent (1.00%) of total Project revenue shall be paid to the Sponsor. *To Be Distributed from Profits In Excess of Bid Profit.*

(c)   Travel/subsistence expenses of Board Representatives or other alternates in respect of Executive Committee Meetings shall be borne by each Party unless agreed upon otherwise.

(d)   No Party without the consent of the other shall make any charges against the Joint Venture for any ordinary home office overhead expenses or for time which may be expended by its officers or employees unless they are employed by the Joint Venture in performing the Contract.

13.   Assignment. No Party shall assign its interest in the Joint Venture without first obtaining the consent of the other Parties which consent shall not be unreasonably withheld.

14.   Distribution of Remaining Funds. Upon the termination of the Joint Venture and after providing for or paying all of its obligations, including those to any of the Parties, any profits

C:\docs\contract\jvblank1.new

remaining shall be distributed and divided between the Parties in accordance with their percentage interests in the Joint Venture. All other assets of the Joint Venture shall be distributed on the same basis.

15.   Improper Payments. The Parties represent and warrant that, in connection with the business to be conducted under this Agreement, no payment has been or will be made by them or by any of their officers, employees, agents, subsidiary or affiliated companies to any officer, official or employee (or to any agent or other person acting on behalf of such a person) of any nation or national company.

This Agreement shall terminate automatically and without notice upon a Party learning of any violation of this clause and that Party shall have no obligation to pay any amount otherwise owing pursuant to this Agreement.

16.   Settlement of Disputes.

   (a)   All disputes arising in connection with this Agreement shall first be referred to senior corporate management of the Parties for settlement.

   (b)   In case agreement cannot be reached as per paragraph 16(a), the matter shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules or a court of competent jurisdiction. The locale of the arbitration shall be New York or such other place as may be mutually agreed by the Parties.

   (c)   Judgment upon award under arbitration may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order for enforcement as the case may be. Arbitration and/or attorney fees shall be assessed against the Party against whom the award is determined, or against both Parties if the determination is against both. The arbitrator/court shall be authorized to award either Party a sum to compensate the Party for the time and expense of the arbitration/suit if the arbitration/suit was demanded without reasonable cause, thereby assessing the costs against the Party instigating arbitration/suit.

17.   Confidential Information. The Parties agree they will not disclose, either during the term of this Agreement or at any time thereafter, to any person, firm or corporation any information concerning the business or affairs of the other Parties, or any subsidiary, affiliate or partner of the other Parties ("Confidential Information") which a Party may have acquired during the term of this Agreement for his own benefit or for the detriment or intended probable detriment of the other Parties. The provisions of this paragraph shall apply during the term of this Agreement and shall survive termination of this Agreement.

18.   Conflicts. In the event that any conflicts shall hereinafter arise between the terms and provisions of this Agreement and the terms and provisions of the Contract, Pre-Bid Agreement or Memorandum of Understanding between the Parties, as the same pertains to the respective rights and

C:\docs\contract\jvblank1.new

obligations of the Joint Venturers hereto as between themselves, the provisions of this Agreement shall control as between the Parties hereto.

19.   Public Statements. The Joint Venture may make public announcements regarding the Joint Venture in the normal course of business provided that no such announcement shall mention the name of a Party without the Party's written consent. Neither Party shall make any public announcement or public disclosure with regard to this Agreement, the Joint Venture or, in the case of a Party, the other Party, the Contract or the activities thereunder, including Confidential Information and non-confidential Information, without the prior written consent of the other Party as to the content and timing of such announcement or disclosure, which consent shall not be unreasonably withheld; provided, however, that nothing shall prevent the Joint Venture or a Party from making such an announcement or disclosure which is required by applicable law, regulation or stock exchange rule.

20.   Notices. All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective when received or, if mailed, on the date set forth on the receipt of registered or certified mail, addressed to the other Party as follows:

Morrison Knudsen International, Inc.
P. O. Box 73
Boise, Idaho 83729.
Attention:      Mr. Patrick L. Petriette
                                                              (Name)

                Executive Vice President
                                                              (Title)

Contrack International, Inc.
1001 North 19th Street
Arlington, Virginia 22209
Attention:      Mr. Karim Camel-Toueg
                                                              (Name)

                                                              (Title)

MISR Sons Development, S.A.E. Hassan Allam Sons
15, Hassan Allam Street
Heliopolis, Cairo, Egypt
Attention:      Mr. Kamal Allam.
                                                              (Name)

                                                              (Title)

21.   Entire Agreement. This Agreement embodies the entire understanding and agreement among the Parties concerning the Joint Venture and supersedes any and all prior negotiations, understandings or agreements in regard thereto.

22.   Severability.  If any provision of this Agreement or the application hereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of such provision to any other person or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by applicable law.

23.   Miscellaneous.  This Agreement shall be interpreted under the laws of the State governing the Contract with the Client, and shall not be amended, modified or revoked except in writing signed by all of the Parties, and shall inure to the benefit of and be binding upon the Parties, their successors, trustees, assigns, receivers and legal representatives, but shall not inure to the benefit of any other person, firm or corporation.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

MORRISON KNUDSEN INTERNATIONAL, INC.

By: _____

Its   _Exec. Vice President_

CONTRACK INTERNATIONAL, INC.

By: _____

Its _EGYPT OPERATION MGR._

MISR SONS DEVELOPMENT S.A.E., HASSAN ALLAM SONS

By: _Kamel Alla_____

Its _M.C. Hassan Allam Sons Co._

C:\docs\contract\jvblank1.new

# Exhibit C

## ASWAN CITIES CONTRACT – SCHEDULE OF PAYMENTS

| Voucher | Date Paid | Amount Paid | | Voucher | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|
| 1 | 12/23/1998 | $1,138,073.05 | | 25 | 03/20/2001 | $4,945,733.82 |
| 2 | 04/18/1998 | $1,381,926.95 | | 26 | 04/10/2001 | $2,275,401.61 |
| 3 | 5/19/1999 | $1,387,491.27 | | 27 | 05/14/2001 | $1,809,510.06 |
| 4 | 07/28/1999 | $773,126.96 | | 28 | 06/07/2001 | $2,232,582.07 |
| 5 | 07/25/1999 | $1,613,397.49 | | 29 | 07/03/2001 | $3,245,279.82 |
| 6 | 08/30/1999 | $1,238,771.60 | | 30 | 08/08/2001 | $5,970,213.92 |
| 7 | 09/21/1999 | $2,059,779.17 | | 31 | 09/13/2001 | $2,882,595.97 |
| 8 | 10/27/1999 | $1,674,462.10 | | 32 | 10/29/2001 | $2,177,776.54 |
| 9 | 11/18/1999 | $1,242,937.47 | | 33 | 11/20/2001 | $2,521,829.79 |
| 10 | 12/20/1999 | $1,747,220.76 | | 34 | 12/23/2001 | $2,999,405.37 |
| 11 | 01/27/2000 | $3,014,591.04 | | 35 | 01/17/2002 | $3,246,841.36 |
| 12 | 02/07/2000 | $2,451,190.29 | | 36 | 02/11/2002 | $1,928,940.02 |
| 13 | 03/14/2000 | $1,088,443.64 | | 37 | 03/24/2002 | $2,055,293.76 |
| 14 | 04/13/2000 | $975,255.27 | | 38 | 05/02/2002 | $1,444,783.60 |
| 15 | 04/26/2000 | $1,586,090.19 | | 39 | 05/21/2002 | $1,999,051.24 |
| 16 | 08/08/2000 | $2,023,595.49 | | 40 | 08/07/2002 | $2,703,696.27 |
| 17 | 10/07/2000 | $1,353,833.66 | | 41 | 10/09/2002 | $429,716.74 |
| 18 | 08/17/2000 | $2,325,318.97 | | 42 | 10/09/2002 | $251,777.17 |
| 19 | 12/09/2000 | $1,608,631.37 | | 43 | 10/09/2002 | $240,903.17 |
| 19A | 10/26/2000 | $9,009,648.53 | | 44 | 11/18/2002 | $545,011.32 |
| 20 | 10/29/2000 | $2,025,413.05 | | 45 | 11/18/2002 | $491,647.00 |
| 21 | 11/28/2000 | $2,405,187.07 | | 46 | 01/08/2003 | $614,800.74 |
| 22 | 12/20/2000 | $1,616,647.54 | | 47 | 02/04/2003 | $466,401.35 |
| 23 | 01/16/2001 | $1,962,719.15 | | 48 | 03/24/2003 | $206,654.15 |
| 24 | 02/15/2001 | $1,740,331.37 | | 49 | 04/06/2003 | $168,862.50 |

## EXHIBIT C

| 50 | 05/15/2003 | $191,107.89 | | | | |
|----|------------|-------------|--|--|--|--|
| 51 | 07/08/2003 | $239,100.95 | | | | |
| 52 | 07/08/2003 | $54,627.30 | | | | |
| 53 | 08/10/2003 | $41,745.00 | | | | |
| 54 | 10/13/2003 | $8,481.01 | | | | |

Aswan Cities Contract – Exhibit C

Exhibit D

# JOINT VENTURE AGREEMENT

THIS AGREEMENT, made this 13 day of June, 2000 between MORRISON
KNUDSEN INTERNATIONAL, INC. ("MK"), a Nevada corporation, P.O. Box 73, Boise,
83729, USA, and, CONTRACK INTERNATIONAL, INC.. ("CII"), a Washington, D.C.
corporation, 1001 North 19th Street, Arlington, Virginia 22209.  The entities shall jointly be
referred to as "Joint Venturer", "Party" or "Parties".

## WITNESSETH:

WHEREAS, the Parties have entered into a Pre-Bid Memorandum of Understanding
in January, 1997 for the purposes of their association and joint prequalification to be
a sub contractor by the Arab Republic of Egypt, National Organization for Potable Water
Sanitary Drainage ("NOPWASD", the "Client") to bid on several contracts which are
commonly known as the "Secondary Cities Project" ("Program") as described therein; and

WHEREAS, the Parties have submitted their prequalification information and have been
duly determined to be qualified to perform the contracts associated with the Program; and

WHEREAS, the Client has issued a Request for Proposal, dated November 09, 1999 for
Contract C, Wastewater Facilities for Luxor Project (the "Project"); and

WHEREAS, the Parties have agreed to enter into a joint venture agreement (the
"Agreement") for the purpose of submitting a joint bid (the "Bid") to the Client, for the Project;

WHEREAS, the Parties desire to enter into this Agreement for the sole purpose of
establishing a joint venture between them, preparing and submitting the Bid to the Client, and
performance of the Project work in the event that the Parties are the successful bidders and are
awarded the contract (the "Contract") for the performance thereof, and desire to fix and define
between themselves their respective interests and liabilities in the performance of the work under
the Contract in the event of an award;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it
is agreed as follows:

1.   Creation of Joint Venture.  The Parties associate themselves as Joint Venturers
for the purpose of preparing and submitting the Bid and performing and completing the Contract
for the Project if such Contract is awarded to the Joint Venture.  The Joint Venture shall operate
under the name Upper Egypt Constructors, a Joint Venture and all money, equipment, materials,
supplies and other property acquired by the Joint Venture shall be held in such name.  In the
event the Joint Venture is not awarded the Contract for the Project, the Joint Venture shall
automatically dissolve and terminate.  In either event, each Party shall bear its own expenses in
connection with the preparation and submittal of the Bid, except as may be mutually agreed
otherwise by and between individual members of the Joint Venture.

This Agreement shall come into force on the date first above mentioned and remain in
force until final acceptance of the works by or on behalf of the Client or until the date of approval
of the final profit and loss account as referred to in Article 14 hereof, whichever is later, provided
that this Agreement shall remain in force thereafter until all rights and obligations which may

**EXHIBIT D**

still exist as against the Client or other third parties have terminated. However, this Agreement shall terminate earlier if either the Bid cannot be agreed upon by the Parties or the Joint Venture is not awarded the Contract.

However, notwithstanding the above paragraph, this Agreement may be terminated by mutual written consent of the Parties provided that all matters as between the Parties or with third parties have been finally settled.

2.    Extent of Joint Venture.  It is specifically understood and agreed between the Parties that this Joint Venture Agreement extends only to the preparation and submittal of the Bid and performance of the Contract for the Project, together with any changes or additions thereto or extra work thereunder, but not to other or different work. The Parties agree that neither they nor any of their affiliated companies will participate in any bid to be submitted by a third party for this Project, except by prior written mutual agreement. It is the intent of the Parties that the Bid shall be satisfactory and acceptable to each of the Parties. If any Party is unable to agree upon the Bid, no Bid shall be submitted, and this Joint Venture shall automatically dissolve and terminate. In such event, each Party shall bear its own expenses to the termination date and each of the Parties shall be free to submit their own individual or joint bids for such Project.

3.    Sponsoring Party. MK is designated as the Sponsor of the Joint Venture. Subject to the control of the Executive Committee of the Joint Venture, the Sponsor, and authorized officers of the Sponsor, shall (i) have management responsibility for the execution of the Contract; (ii) appoint or employ such officers, employees or agents of the Joint Venture as it deems necessary or appropriate; (iii) bind the Joint Venture with third parties by contract, (iv) receive payments in respect of the work on behalf of the Joint Venture, (v) receive an act upon instructions from the Client, (vi) incur liabilities and settle disputes on behalf of the Joint Venture, and (vii) exercise such powers as are necessary or convenient to fulfill the purposes of the Joint Venture.

4.    Executive Committee.

(a)    The Executive Committee shall determine general policies affecting the Joint Venture and shall oversee the activities of the Project Manager ("Project Manager") appointed by the Sponsoring Joint Venturer. Each Party shall be represented on the Executive Committee and shall have one vote, provided that no Party shall exercise any votes during any period of its default under the terms of this Agreement, as defined in paragraph 11.

The Joint Venture shall execute the Project an autonomous entity under the control of the Executive Committee with the day-to-day operations managed by the Project Manager. The Executive Committee shall:

1.    Develop policies affecting the overall performance of the Project.

2.    Determine working capital requirements in accordance with the provisions of paragraph 8.

3.    Establish bank accounts in accordance with the provisions of paragraph 9.

CONTRACK INTERNATIONAL, INC.

4. Approve insurance policies, including limits and changes thereto.

5. Approve bonds and any changes thereto.

6. Approve employing lawyers on behalf of the Joint Venture in excess to any budgets approved in the Bid.

7. Approve employing consultants on behalf of the Joint Venture in excess to any budgets approved in the Bid.

8. Approve settlement of claims against the Joint Venture, including claims by subcontractors and suppliers in excess of $25,000.

9. Approve commencement and conduct of defense or settlement of claims or litigation involving the Joint Venture in excess of $50,000.

10. Approve subcontracts, purchase orders, sale of assets and lease agreements in excess of $100,000.

11. Approve any collective labor agreements or settlement of disputes resulting therefrom.

12. Approve any changes or modifications to the Contract in excess of $100,000.

13. Approve any subcontract or binding agreement between any of the Parties and the Joint Venture.

14. Approve any changes to the project budget included in the Bid.

15. Approve all matters of a political, environmental or public relations nature, including the designation of an official spokesperson for the Joint Venture.

16. Approve the auditors for the Joint Venture.

17. Approve billing rates of personnel seconded to the project by the Parties and the billing rates for any Party's home office personnel assisting the Project.

18. Approval of Project Manager appointed by Sponsoring Joint Venturer.

The Project Manager shall have authority to manage the operations of the Project and to make all decisions not reserved to the Executive Committee above and take all other actions required to complete the Project, except that the Executive Committee may in, from time to time, add to or delete from the above listed activities.

(b)     Each party shall appoint one representative to the Executive Committee and one alternate who shall have authority to act in the representative's absence. Either Party may change its representative or alternate by giving written notice of his successor

CONTRACK INTERNATIONAL, INC.

to the other.  Mr. Patrick L. Pettiette is designated as the initial representative of MK and Mr. James Voorhees is designated as the initial alternate representative of MK; Mr. Nassef Sawaris is designated as the initial representative of CII and Mr. Osama Bishai is designated as the initial alternate representative of CII.

(c)     The Executive Committee shall be chaired by the representative of the Sponsor.  The chairman shall call meetings of the Committee by giving adequate notice to the Parties when it is deemed necessary or whenever requested to do so by any of the Parties.  A quorum shall be constituted when all the representative or their alternates are present at the Executive Committee Meeting and no Party chall exercise any votes during any period of its default under the term of this Agreement as defined in Article 11.

The Executive Committee shall endeavor to act by the unanimous vote of the representatives.  In the event that the Executive Committee is unable unanimously to agree on an action, the dispute shall be submitted in writing to the Senior Executive Officer of the respective Joint Venture partners who shall attempt to resolve the dispute within ten days of receipt. In the event that a resolution is not obtained in this manner, the Sponsoring Party may make a decision based on the best information available where immediate action is required to (i) prevent damage to the Project; (ii) prevent a breach of contract between the Joint Venture and any other party; (iii) prevent the unnecessary incurrence of costs on the Project; or (iv) prevent delay in the completion date of the Project.  However, the exercise of such decision-making authority by the Sponsor shall not prohibit the other representatives from submitting such matter to arbitration or a court of competent jurisdiction as provided in paragraph 16.  The Sponsor's ruling shall remain in force until such time any future Executive Committee shall rescind it or until the issue has been settled in accordance with Arbitration or Court proceedings. If any Party is in default under this Agreement, then during the time of such default, its representative shall not vote upon any issue, and such representative shall not be included in the computation of eligible votes.  All actions taken by the Executive Committee shall be confirmed within one week by the Chairman in a written report to the other Executive Committee members..

5.     Liability, Share of Profits and Losses: Contributions.  The Parties shall be jointly and severally liable to the Client for the performance of the Contract .

The interests of the Parties in and to any profits and assets derived from the performance of the Contract, and in and to any property acquired by this Joint Venture in connection with the work to be performed thereunder, and in and to all contributions required, all moneys received and losses incurred in the performance of the Contract shall be those percentages set opposite their respective names (the "Sharing Ratio") as follows:

| | |
|---|---|
| MK | 60% |
| CII | 40% |

In the event any Party independently causes direct loss, damage or liability whatsoever to another Party or to any third party, such Party shall hold harmless, indemnify and defend the other Party against such loss, damage or liability incurred.   Neither Party shall claim from the other any indirect, consequential, punitive, penalty or liquidated loss, damage or liability save those (if any) which have been adjudged to have been suffered by the Client or a third party as a result of a Party's independent acts or omissions.

Each of the Parties hereby indemnifies the other against any loss or liability, which does not arise by reason of the other Party's negligence or intentional misconduct, sustained in the performance of the Contract which exceeds the amount computed under the stated percentages. Such indemnified amount shall be due and payable within 15 Business Days after written notice thereof and demand for payment. A "Business Day" shall mean any day other than Saturday, Sunday or any legal holiday observed in the Arab Republic of Egypt.

6.   **Surety Bonds; Financial Obligations.** The Parties have agreed that MK shall arrange for the tender and performance bonds as may be required by the Bid and Contract; however, any costs incurred by MK in securing the bonds shall be charged to the Joint Venture. Each of the Parties agrees to execute all applications and indemnity agreements required by the parties upon any bond or bonds required in connection with the said Bid and Contract. All financial obligations assumed by the Joint Venture in connection with the performance of the Contract, all liabilities assumed by or charged to the Joint Venture as contractor, guarantor or indemnitor in connection with any surety bond or other bonds which may be given or executed in connection with the Bid or Contract, and all other obligations and liabilities of any kind or character which are assumed or undertaken by the Joint Venture in connection with and for the benefit of the performance of the Bid or Contract shall be shared by the Parties proportionately and in accordance with their respective interests as set forth in paragraph 4 hereof, except as set forth in paragraph 1 hereof.

Except as expressly provided in this Agreement, or as otherwise agreed in writing by such Party, no Party shall have any liability or obligation to any third party (including, without limitation, any subcontractor) by reason of any obligation of or performance by the Joint Venture under the Contract or any other matter pertaining to the Joint Venture.

7.   **Joint Venture Equipment.** Equipment necessary for the performance of the Contract may be contributed by one or more of the Parties. In the event equipment is contributed by a Party, the following will apply:

(a)   The Executive Committee will determine the fair market value for the equipment. In the event the Executive Committee cannot agree on a fair market value, the value shall be established by an independent equipment appraiser selected by the Executive Committee and hired at the expense of the Joint Venture.

(b)   The Executive Committee will thereafter determine whether the equipment will be purchased by the Joint Venture at the established fair market value or rented by the Joint Venture.

(c)   If the equipment is to be rented from a Party, the Joint Venture will enter into a rental agreement with the owning Party, which agreement will set forth rental rates, length of rental, responsibility for major and minor repairs and other terms typically found in a standard rental agreement.

(d)   In the event the equipment is purchased by the Joint Venture, the Party contributing the equipment will have first right of refusal to repurchase the equipment upon disposal of the equipment by the Joint Venture.

8.    Working Capital.

(a)    All necessary working capital, when and as required for the performance and prosecution of the Contract, as determined by the Executive Committee, shall be furnished by the Parties proportionately in accordance with their respective interests as set forth in paragraph 5 hereof. Each of the Parties recognizes that the failure of any Party to contribute its designated share of working capital will have serious adverse consequences for the Joint Venture and imposes an unfair burden upon the other Parties. As to such working capital contribution, each of the Parties waives any rights of set-off it might otherwise possess, and agrees to make the working capital contributions without set-off or deduction of any type. If any Party borrows funds to meet its obligations hereunder, such borrowing shall be the sole and separate obligation of the Party and shall not be the debt or obligation of the Joint Venture. None of the Parties, nor their representatives, shall have the power to pledge the credit of any other Party, nor to pledge the joint credit of all the Parties, except by unanimous consent of the Parties.

(b)    The Executive Committee shall determine the working capital needs of the Joint Venture and, to the extent such needs cannot reasonably be met from cash on hand or Project revenues, shall give written notice (a "Capital Call") to the Parties of the amount of cash or other capital that must be contributed by the Parties (a "Capital Contribution").

(c)    Upon receipt of a Capital Call, each Party shall be obligated to make a Capital Contribution as specified in the notice given pursuant to paragraph 8(b) or, if no such period is specified, a period of ten (10) days after the giving of the notice of the Capital Call (the "Capital Call Period") to make a Capital Contribution to the capital of the Joint Venture of cash or other capital specified in the Capital Call in an amount determined by applying the Party's Sharing Ratio (as adjusted as of the time of the Capital Call) to the total amount of cash or other capital specified in the Capital Call.

(d)    If any Party fails to make any required payment under this paragraph 8 prior to expiration of the Capital Call Period, the other Party may advance (a "Capital Call Advance") to the Joint Venture any part or all of such required payment. A Capital Call Advance shall be deemed to be an additional Capital Contribution by the advancing Party, and such Party's Sharing Ratio shall be adjusted accordingly as of the time of the making of the Capital Call Advance, except as provided in paragraph 8(f) below.

(e)    Capital Contributions shall be expended in furtherance of the business of the Joint Venture. All costs and expenses of the Joint Venture shall be paid from its funds. No interest shall be paid on Capital Contributions. Except as expressly provided in this Agreement, no Party shall have any personal liability for the repayment of any Capital Contribution made by another Party.

(f)    To the extent either Party pays any liability or obligation to any third Party other than the Joint Venture arising out of or in any way connected with this Agreement or the Joint Venture, except for any liabilities or obligations that are the subject of paragraph 6, such payment shall be treated for all purposes of this Agreement, including adjustments of Sharing Ratios, as if such payment were a Capital Contribution made in response to a Capital Call pursuant to paragraph 8(c) of this Agreement; and to the extent any such payment exceeds the amount determined by applying such Party's Sharing

Ratio, as adjusted as of the time immediately prior to such payment to the total amount of such liability or obligation, such excess shall be treated, for all purposes of this Agreement, as if such excess were a Capital Call Advance within the meaning of paragraph 8(d) of this Agreement; provided that in the event a portion of a payment made pursuant to this paragraph 8(f) is deemed to be a Capital Call Advance, the Party on whose behalf such Capital Call Advance was made shall have ten (10) days from the making of such advance to reimburse such advance to the paying Party, in which case such reimbursement shall likewise be deemed to be a Capital Contribution for all purposes of this Agreement, including adjustment of Sharing Ratios.

9.  **Bank Accounts**.  All funds advanced by the Parties or borrowed by the Joint Venture for its account and all progress and final payments or other revenue received as a result of the performance of the Contract shall be deposited to the account of the Joint Venture in an account to be established at such bank or banks as the Executive Committee may designate. Bills may be drawn on said account or accounts by signatures of such persons as may be designated from time to time by the Executive Committee. The Joint Venture may also maintain payroll or other accounts at such bank or at such branch or at such other bank as the Executive Committee may designate, which may be drawn upon by the signature or signatures of such persons as may be designated by the Executive Committee. No part of any advances deposited in said bank account or accounts shall be returned to any of the Parties, and no distribution of profits shall be made, prior to the completion of the Project, except as may be mutually agreed upon by the Parties in writing.

10.  **Financial Affairs**.  Adequate books of account shall be maintained by the Joint Venture and such books of account may be examined by any of the Parties at all reasonable times. The Joint Venture staff shall make reports of the financial condition of the Joint Venture and the progress of the work shall be made to the Executive Committee no less frequently than quarterly.

11.  **Default and Insolvency**.  If a Party shall be in default hereunder, and fail to cure such default after written notice or demand, as the case may be, cease to operate or terminate its business affairs, institute an insolvency procedure under applicable law, permit the entry of any order for relief under Chapter 7 of the Bankruptcy Code, or fail to cure a default hereunder after entry of an order for relief under Chapter 11 of the Bankruptcy Code, (such Party being hereinafter referred to as "Defaulting or Insolvent Party"), then from and after such date:

(a)  all acts, consents and decisions with respect to the performance of the Contract or the management of the Joint Venture shall thereafter be taken solely by the remaining Party or Parties without considering the Defaulting or Insolvent Party.

(b) the participation of the Insolvent Party in the profits of the Joint Venture shall be limited to that proportion which the Defaulting or Insolvent Party's contributions to the working fund of the Joint Venture bear to the total of such contributions as same may be modified by and subject to the provisions of paragraph 8(b) hereof, but the Defaulting or Insolvent Party shall be charged with, and shall be liable for, any and all losses that may be suffered by the Joint Venture under said Contract, or any additions or supplements thereto or modifications thereof, to the full extent of the Defaulting or Insolvent Party's percentage of participation, set forth in paragraph 5 hereof.

12. Project Costs.

(a) All costs and charges as proposed by the Parties and agreed by the Executive Committee shall be considered costs of the Project chargeable in the proportions of the participating interest of each Party.

(b) A Sponsor management fee of three fourths of one percent (1.00%) of Project revenue shall be paid to the Sponsor.

(c) Travel/subsistence expenses of Board Representatives or other alternate in respect of Executive Committee Meetings shall be borne by each Party unless agreed upon otherwise.

(d) No Party without the consent of the other shall make any charges against the Joint Venture for any ordinary home office overhead expenses or for time which may be expended by its officers or employees unless they are employed by the Joint Venture in performing the Contract.

13. Assignment. No Party shall assign its interest in the Joint Venture without obtaining the consent of the other Parties which consent shall not be unreasonably withheld.

14. Distribution of Remaining Funds. Upon the termination of the Joint Venture, after providing for or paying all of its obligations, including those to any of the Parties, the profits remaining shall be distributed and divided between the Parties in accordance with their percentage interests in the Joint Venture. All other assets of the Joint Venture shall be distributed on the same basis.

15. Improper Payments. The Parties represent and warrant that, in connection with the business to be conducted under this Agreement, no payment has been or will be made by them or by any of their officers, employees, agents, subsidiary or affiliated companies to any officer, official or employee (or to any agent or other person acting on behalf of such a person) of any nation or national company.

This Agreement shall terminate automatically and without notice upon a Party learning of any violation of this clause and that Party shall have no obligation to pay any amount otherwise owing pursuant to this Agreement.

16. Settlement of Disputes.

(a) All disputes arising in connection with this Agreement shall first be referred to senior corporate management of the Parties for settlement.

(b) In case agreement cannot be reached as per paragraph 16(a), the matter shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules or a court of competent jurisdiction. The locale of the arbitration shall be New York or such other place as may be mutually agreed by the Parties.

(c)    Judgment upon award under arbitration may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order for enforcement as the case may be.  Arbitration and/or attorney fees shall be assessed against the Party against whom the award is determined, or against both Parties if the determination is against both.  The arbitrator/court shall be authorized to award either Party a sum to compensate the Party for the time and expense of the arbitration/suit if the arbitration/suit was demanded without reasonable cause, thereby assessing the costs against the Party instigating arbitration/suit.

17.    Confidential Information.  The Parties agree they will not disclose, either during the term of this Agreement or at any time thereafter, to any person, firm or corporation any information concerning the business or affairs of the other Parties, or any subsidiary, affiliate or partner of the other Parties ("Confidential Information") which a Party may have acquired during the term of this Agreement for his own benefit or for the detriment or intended probable detriment of the other Parties.  The provisions of this paragraph shall apply during the term of this Agreement and shall survive termination of this Agreement.

18.    Conflicts.  In the event that any conflicts shall hereinafter arise between the terms and provisions of this Agreement and the terms and provisions of the Contract, Pre-Bid Agreement or Memorandum of Understanding between the Parties, as the same pertains to the respective rights and obligations of the Joint Venturers hereto as between themselves, the provisions of this Agreement shall control as between the Parties hereto.

19.    Public Statements.  The Joint Venture may make public announcements regarding the Joint Venture in the normal course of business provided that no such announcement shall mention the name of a Party without the Party's written consent.  Neither Party shall make any public announcement or public disclosure with regard to this Agreement, the Joint Venture or, in the case of a Party, the other Party, the Contract or the activities thereunder, including Confidential Information and non-confidential Information, without the prior written consent of the other Party as to the content and timing of such announcement or disclosure, which consent shall not be unreasonably withheld; provided, however, that nothing shall prevent the Joint Venture or a Party from making such an announcement or disclosure which is required by applicable law, regulation or stock exchange rule.

20.    Notices.  All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective when received or, if mailed, on the date set forth on the receipt of registered or certified mail, addressed to the other Party as follows:

Morrison Knudsen International, Inc.
P. O. Box 73
Boise, Idaho 83729
Attention:    Mr. Patrick L. Pettiette
                                        (Name)

Executive Vice President
                                        (Title)

Contrack International, Inc.
1001 North 19th Street
Arlington, Virginia 22209
Attention:   Mr. Karim Camel-Toueg

_____
                                                    (Name)

_____
                                                    (Title)

21.   **Entire Agreement**.  This Agreement embodies the entire understanding and agreement among the Parties concerning the Joint Venture and supersedes any and all negotiations, understandings or agreements in regard thereto.

22.   **Severability**.  If any provision of this Agreement or the application hereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of such provision to any other person or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by applicable law.

23.   **Miscellaneous**.  This Agreement shall be interpreted under the laws of the country governing the Contract with the Client, and shall not be amended, modified or revoked except in writing signed by all of the Parties, and shall inure to the benefit of and be binding upon the Parties, their successors, trustees, assigns, receivers and legal representatives, but shall not inure to the benefit of any other person, firm or corporation.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

MORRISON KNUDSEN INTERNATIONAL, INC.

By:

Its _Vice Pres_

CONTRACK INTERNATIONAL, INC.

By: _____

Its _Vice President_

Copy Certification

Idaho

of Ada                    S.S.

19th day to June, 2000, I certify that the preceding document is a true, exact, and unaltered photocopy made by me of the Joint Venture Agreement with Knudsen International, Inc. and Contrack International, Inc.

Janiece Haylett            Notary Public

My Commission Expires on 5 April 2003

Exhibit E

 **MORRISON KNUDSEN / CONTRACK INTERNATIONAL J.V**
Luxor, Egypt

# Facsimile Transmission

Contrack International Inc.                          4 June 2001
160, 26th July St.
Agouza, Cairo, Egypt                                *16 pages including*
Attention:     Mr. Osama Bishai, VICE President      *this cover.*
Facsimile Number: (202) 303 0506

Misr Sons Development S.A.E., Hassan Allam Sons
Yehia Zakaria St., Industrial Zone
Behind Sheraton Heliopolis
Attention:  Mr. Kamal Allam
Facsimile Number: 266 6920

| ORASCOM | | |
|---|---|---|
| | Action | Info |
| NS | | |
| OB | ox | |
| MA | ~ | |
| MM | | |
| WS | | |
| Sh.A. | | |
| Ph.M | | |
| ٤.Ph | | |
| F.F. | | |
| File | X | |

Subject:      **Joint Venture Agreement**
              Luxor Wastewater Facilities

**Distribution: By Facsimile**

Partners:

Attached are the following:

1.  Revised three party JV Agreement incorporating the comments contained in
    the various suggestions.
2.  Copy of comments received from Orascom with notes on items incorporated
    and rational regarding why or why not each was incorporated.
3.  Copy of comments received from Hassan Allam Sons with notes on items
    incorporated and rational regarding why or why not each was incorporated.

These comments and draft have been provided to Pat Pettiette, Mike Gillespie and
Kevin Holderness in Boise for final review.

If you have any further questions or discussion, please advise.

Very truly yours,

Art Peavey


RECEIVED
0 5 JUN 2001


RECEIVED
JUN 2001

Cc:   Pat Pettiette, et. al.
      Wade Miller

**EXHIBIT E**

Exhibit F

# JOINT VENTURE AGREEMENT

THIS AGREEMENT, made this 7th day of March, 2001 between WASHINGTON INTERNATIONAL INC. (WII), an Nevada corporation, 720 Park Boulevard, Boise, Idaho 83712, USA, CONTRACK INTERNATIONAL INC. (CII), a Washington, D.C. corporation, 1001 North 19th Street, Arlington, Virginia 22209, and MISR SONS DEVELOPMENT S. A. E., HASSAN ALLAM SONS ("HAS") an Egyptian corporation, Yehia Zakaria Street – Industrial Zone, behind Sheraton Heliopolis, Cairo Egypt. The entities shall jointly be referred to as "Joint Venturer", "Party" or "Parties".

## WITNESSETH:

WHEREAS, the Parties have entered into a Pre-Bid Memorandum of Understanding dated 5 January 1997 for the purposes of their association and joint prequalification to be selected as contractor by the Arab Republic of Egypt, National Organization for Potable Water and Sanitary Drainage ("NOPWEASD") the "Client") to bid on several contracts which are collectively known as the "Secondary Cities Project" ("Program") as described therein; and

WHEREAS, the Parties have submitted their prequalification information and have been jointly determined to be qualified to perform the contracts associated with the Program; and

WHEREAS, the Client has issued a Request for Proposal, dated November 9, 1999 for the Contract C, Wastewater Facilities for the Luxor Project, (the "Project"); and

WHEREAS, the Parties have agreed to enter into a joint venture agreement (the "Agreement") for the purpose of submitting a joint bid (the "Bid") for the Project; and

WHEREAS, the Parties desire to enter into this Agreement for the sole purpose of establishing a joint venture between them, preparing and submitting the Bid to the Client, and performance of the Project work in the event that the Parties are the successful bidders and are awarded the contract (the "Contract") for the performance thereof, and desire to fix and define between themselves their respective interests and liabilities in the performance of the work under said Contract in the event of an award;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is agreed as follows:

1.   Creation of Joint Venture. The Parties associate themselves as Joint Venturers for the purpose of preparing and submitting the Bid and performing and completing the Contract for the Project if such Contract is awarded to the Joint Venture. The Joint Venture shall operate under the name Washington International, Inc./Contrack International Inc. Joint Venture (WII/CII JV) and all money, equipment, materials, supplies and other property acquired by the Joint Venture shall be held in such name. In the event the Joint Venture is not awarded the Contract for the Project, the Joint Venture shall automatically dissolve and terminate. In either event, each Party shall bear its own expenses in connection with the preparation and

submittal of the Bid, except as may be mutually agreed otherwise by and between individual members of the Joint Venture.

This Agreement shall come into force on the date first above mentioned and remain in force until final acceptance of the works by or on behalf of the Client or until the date of approval of the final profit and loss account as referred to in Article 14 hereof, whichever is later, provided that this Agreement shall remain in force thereafter until all rights and obligations which may still exist as against the Client or other third parties have terminated. However, this Agreement shall terminate earlier if either the Bid cannot be agreed upon by the Parties or the Joint Venture is not awarded the Contract.

However, notwithstanding the above paragraph, this Agreement may be terminated by mutual written consent of the Parties provided that all matters as between the Parties or with third parties have been finally settled.

2.    Extent of Joint Venture.  It is specifically understood and agreed between the Parties that this Joint Venture Agreement extends only to the preparation and submittal of the Bid and performance of the Contract for the Project, together with any changes or additions thereto or extra work thereunder, but not to other or different work.  The Parties agree that neither they nor any of their affiliated companies will participate in any bid to be submitted by a third party for this Project, except by prior written mutual agreement.  It is the intent of the Parties that the Bid shall be satisfactory and acceptable to each of the Parties.  If any Party is unable to agree upon the Bid, no Bid shall be submitted, and this Joint Venture shall automatically dissolve and terminate.  In such event, each Party shall bear its own expenses to the termination date and each of the Parties shall be free to submit their own individual or joint bids for such Project.

3.    Sponsoring Party.  WII is designated as the Sponsor of the Joint Venture.  Subject to the control of the Executive Committee of the Joint Venture, the Sponsoring Joint Venturer shall (a) have management responsibility for the execution of the Contract; (b) appoint or employ such officers, employees or agents of the Joint Venture as it deems necessary or appropriate;  (c) bind the Joint Venture with third parties by contract; (d) receive payments in respect of the work on behalf of the Joint Venture; (e) receive and act upon instructions from the Client; (f) incur liabilities and settle disputes on behalf of the Joint Venture; (g) exercise such powers as are necessary or convenient to fulfill the purposes of the Joint Venture; and provide detailed technical and financial monthly reports to all the parties.

4.    Executive Committee.

(a)    The Executive Committee shall determine general policies affecting the Joint Venture and shall oversee the activities of the Project Manager ("Project Manager") appointed by the Sponsoring Joint Venturer.  Each Party shall be represented on the Executive Committee and shall have one vote, provided that no Party shall exercise any votes during any period of its default under the terms of this Agreement, as defined in paragraph 11.

The Joint Venture shall execute the Project as an autonomous entity under the control of the Executive Committee with the day-to-day operations managed by the Project Manager. The Executive Committee shall:

1. Develop policies affecting the overall performance of the Project.

2. Determine working capital requirements in accordance with the provisions of paragraph 8.

3. Establish bank accounts in accordance with the provisions of paragraph 9.

4. Approve insurance policies, including limits and changes thereto.

5. Approve bonds and any changes thereto.

6. Approve employing lawyers on behalf of the Joint Venture in excess of any budgets approved in the Bid.

7. Approve employing consultants on behalf of the Joint Venture in excess to any budgets approved in the Bid.

8. Approve settlement of claims against the Joint Venture, including claims by subcontractors and suppliers in excess of $25,000.00.

9. Approve commencement and conduct of defense or settlement of claims or litigation involving the Joint Venture in excess of $50,000.00.

10. Approve subcontracts, purchase orders, sale of assets and lease agreements in excess of $100,000.00.

11. Approve any collective labor agreements or settlement of disputes resulting therefrom.

12. Approve any changes or modifications to the Contract in excess of $100,000.00.

13. Approve any subcontract or binding agreement between any of the Parties and the Joint Venture.

14. Approve any changes to the project budget included in the Bid.

15. Approve all matters of a political, environmental or public relations nature, including the designation of an official spokesperson for the Joint Venture.

16. Approve the auditors for the Joint Venture.

17. Approve billing rates of personnel seconded to the project by the Parties and the billing rates for any Party's home office personnel assisting the Project.

18. Approval of Project Manager appointed by the Sponsoring Joint Venturer.

The Project Manager shall have authority to manage the operations of the Project and to make all decisions not reserved to the Executive Committee above and take all other actions required to complete the Project, except that the Executive Committee may, from time to time, add to or delete from the above listed activities.

(b)       Each party shall appoint one representative to the Executive Committee and one alternate who shall have authority to act in the representative's absence. Either Party may change its representative or alternate by giving written notice of his successor to the other.   Mr. Patrick L. Pettiette is designated as the initial representative of WII and Mr. Arthur F. Peavey is designated as the initial alternate representative of WII; Mr. Nassef Sawaris is designated as the initial representative of CII and Mr. Osama Bishai is designated as the initial alternate representative of CII; Mr. Kamal Allam is designated as the initial representative of HAS and Mr. Mohey El Din Ahmed is designated as the initial alternate representative of HAS.

(c)       The Executive Committee shall be chaired by the representative of the Sponsoring Joint Venturer.  The chairman shall call meetings of the Committee giving adequate notice to the Parties when it is deemed necessary or whenever requested to do so by any of the Parties.  A quorum shall be constituted when the representative of all Parties or their alternates are present at the Executive Committee Meeting and no Party shall exercise any votes during any period of its default under the term of this Agreement as defined in Article 11.

The Executive Committee shall endeavor to act by the unanimous vote of the representatives.  In the event that the members of the Executive Committee are unable unanimously to agree on an action, the dispute shall be submitted in writing to the Senior Executive Officer of the respective Joint Venture partners who shall attempt to resolve the dispute within ten days of receipt.  In the event that a resolution is not obtained in this manner, the Sponsoring Party may make a decision based on the best information available where immediate action is required to (i) prevent damage to the Project; (ii) prevent a breach of contract between the Joint Venture and any other party; (iii) prevent the unnecessary incurrence of costs on the Project; or (iv) prevent delay in the completion date of the Project.  However, the exercise of decision-making authority by the Sponsoring Party shall not prohibit the other Party from submitting such dispute to arbitration or a court of competent jurisdiction as provided in paragraph 16.  The Sponsoring Party's ruling shall remain in force until such time any future Executive Committee shall rescind it or until the issue has been settled in accordance with Arbitration or Court proceedings.  If any Party is in default under this Agreement during the time of such default, its representative shall not vote upon any issue, and such representative shall not be included in the computation of eligible votes.  All actions taken by the Executive Committee shall be confirmed within one week by the Chairman in a written report to the other Executive Committee members.

5.     Liability; Share of Profits and Losses; Contributions.  The Parties shall be jointly and severally liable to the Client for performance of the Contract.

The interests of the Parties in and to any profits and assets derived from the performance of the Contract, and in and to any property acquired by this Joint Venture in connection with the work to be performed thereunder, and in and to all contributions required, all moneys received and losses incurred in the performance of the Contract shall be those percentages set opposite their respective names (the "Sharing Ratio") as follows:

| | |
|---|---|
| WII | 45.0% |
| CII | 30.0% |
| HAS | 25.0% |
| | 100.0% |

In the event any Party independently causes direct loss, damage or liability whatsoever to another party, such Party shall hold harmless, indemnify and defend the other Party against such loss, damage or liability incurred.  Neither Party shall claim from the other any indirect, consequential, punitive, penalty or liquidated loss, damage or liability save those (if any) which have been adjudged to have been suffered by the client or a third party as a result of a Party's independent acts or omissions.

Each of the Parties hereby indemnifies the other Parties against any loss or liability, which does not arise by reason of the other Party's negligence or intentional misconduct, sustained in the performance of the Contract which exceeds the amount computed under the stated percentages.  Such indemnified amount shall be due and payable within 15 Business Days after written notice thereof and demand for payment.  A "Business Day" shall mean any day other than Friday, Saturday, Sunday or any legal holiday observed in the Arab Republic of Egypt.

6.  Surety Bonds; Financial Obligations.  The Parties have agreed that WII shall arrange for the tender bond and that all parties shall jointly arrange for performance bonds as may be required by the Client; however, any costs incurred by one of the Parties in securing the bonds shall be charged to the Joint Venture.  Each of the Parties agrees to execute all applications and indemnity agreements required by the sureties or banks upon any bond, bonds, letters of credit or other securities required in connection with the said Bid and Contract.  All financial obligations assumed by the Joint Venture in connection with the performance of the Contract, all liabilities assumed by or charged to the Joint Venture as contractor, guarantor or indemnitor in connection with any surety bond or other bonds which may be given or executed in connection with the Bid or Contract, and all other obligations and liabilities of any kind or character which are assumed or undertaken by the Joint Venture in connection with and for the benefit of the performance of the Bid or Contract shall be shared by the Parties proportionately and in accordance with their respective interests as set forth in paragraph 4 hereof, except as set forth in paragraph 1 hereof.

Except as expressly provided in this Agreement, or as otherwise agreed in writing by such Party, no Party shall have any liability or obligation to any third party (including, without limitation, any subcontractor) by reason of any obligation of or performance by the Joint Venture under the Contract or any other matter pertaining to the Joint Venture.

7.    Joint Venture Equipment.  Equipment necessary for the performance of the Contract may be contributed by one or more of the Parties.  In the event equipment is contributed by a Party, the following will apply:

(a)    The Executive Committee will determine the fair market value for the equipment.  In the event the Executive Committee cannot agree on a fair market value, the value shall be established by an independent equipment appraiser selected by the Executive Committee and hired at the expense of the Joint Venture.

(b)    The Executive Committee will thereafter determine whether the equipment will be purchased by the Joint Venture at the established fair market value or rented by the Joint Venture.

(c)    If the equipment is to be rented from a Party, the Joint Venture will enter into a rental agreement with the owning Party, which agreement will set forth rental rates, length of rental, responsibility for major and minor repairs and other terms typically found in a standard rental agreement.

(d)    In the event the equipment is purchased by the Joint Venture, the Party contributing the equipment will have first right of refusal to repurchase the equipment upon disposal of the equipment by the Joint Venture.

8.    Working Capital.

(a)    All necessary working capital, when and as required for the performance and prosecution of the Contract, as determined by the Executive Committee, shall be furnished by the Parties proportionately in accordance with their respective interests as set forth in paragraph 5 hereof.  Each of the Parties recognizes that the failure of any Party to contribute its designated share of working capital will have serious adverse consequences for the Joint Venture and imposes an unfair burden upon the other Parties.  As to such working capital contribution, each of the Parties waives any rights of set-off it might otherwise possess, and agrees to make the working capital contributions without set-off or deduction of any type.  If any Party borrows funds to meet its obligation hereunder, such borrowing shall be the sole and separate obligation of the Party and shall not be the debt or obligation of the Joint Venture.  None of the Parties, or their representatives, shall have the power to pledge the credit of any other Party, nor to pledge the joint credit of all the Parties, except by unanimous consent of the Parties.

(b)    The Executive Committee shall determine the working capital needs of the Joint Venture and, to the extent such needs cannot reasonably be met from cash on hand or Project revenues, shall give written notice (a "Capital Call") to the Parties of the amount of cash or other capital that must be contributed by the Parties (a "Capital Contribution").

(c)    Upon receipt of a Capital Call, each Party shall be obligated to make a Capital Contribution as specified in the notice given pursuant to paragraph 8(b) or, if no such

period is specified, a period of ten (10) days after the giving of the notice of the Capital Call (the "Capital Call Period") to make a Capital Contribution to the capital of the Joint Venture of cash or other capital specified in the Capital Call in an amount determined by applying the Party's Sharing Ratio (as adjusted as of the time of the Capital Call) to the total amount of cash or other capital specified in the Capital Call.

(d)     If any Party fails to make any required payment under this paragraph 8 prior to expiration of the Capital Call Period, the other Party may advance (a "Capital Call Advance") to the Joint Venture any part or all of such required payment. A Capital Call Advance shall be deemed to be an additional Capital Contribution by the advancing Party, and such Party's Sharing Ratio shall be adjusted accordingly as of the time of the making of the Capital Call Advance, except as provided in paragraph 8(f) below.

(e)     Capital Contributions shall be expended in furtherance of the business of the Joint Venture. All costs and expenses of the Joint Venture shall be paid from its funds. No interest shall be paid on Capital Contributions. Except as expressly provided in this Agreement, no Party shall have any personal liability for the repayment of any Capital Contribution made by another Party.

(f)     To the extent either Party pays any liability or obligation to any third Party other than the Joint Venture arising out of or in any way connected with this Agreement or the Joint Venture, except for any liabilities or obligations that are the subject of paragraph 6, such payment shall be treated for all purposes of this Agreement, including adjustments of Sharing Ratios, as if such payment were a Capital Contribution made in response to a Capital Call pursuant to paragraph 8(c) of this Agreement; and to the extent any such payment exceeds the amount determined by applying such Party's Sharing Ratio, as adjusted as of the time immediately prior to such payment to the total amount of such liability or obligation, such excess shall be treated, for all purposes of this Agreement, as if such excess were a Capital Call Advance within the meaning of paragraph 8(d) of this Agreement; provided that in the event a portion of a payment made pursuant to this paragraph 8(f) is deemed to be a Capital Call Advance, the Party on whose behalf such Capital Call Advance was made shall have ten (10) days from the making of such advance to reimburse such advance to the paying Party, in which case such reimbursement shall likewise be deemed to be a Capital Contribution for all purposes of this Agreement, including adjustment of Sharing Ratios.

9.     Bank Accounts. All funds advanced by the Parties or borrowed by the Joint Venture for its account and all progress and final payments or other revenue received as a result of the performance of the Contract shall be deposited to the account of the Joint Venture in an account to be established at such bank or banks as the Executive Committee may designate. Checks may be drawn on said account or accounts by signatures of such persons as may be designated from time to time by the Executive Committee.  The Joint Venture may also maintain payroll or other accounts at such bank or at such branch or at such other bank as the Executive Committee may designate, which may be drawn upon by the signature or signatures of such persons as may be designated by the Executive Committee. No part of any advances deposited in said bank account or accounts shall be returned to any of the Parties, and no

distribution of profits shall be made, prior to the completion of the Project, except as may be mutually agreed upon by the Parties in writing.

10.   Financial Affairs.  Adequate books of account shall be maintained by the Joint Venture and such books of account may be examined by any of the Parties at all reasonable times. The Joint Venture staff shall make reports of the financial condition of the Joint Venture and the progress of the work shall be made to the Executive Committee no less frequently than quarterly.

11.   Default and Insolvency.  If a Party shall be in default hereunder, and fail to cure such default after written notice or demand, as the case may be, cease to operate or terminate its business affairs, institute an insolvency procedure under applicable law, permit the entry of any order for relief under Chapter 7 of the Bankruptcy Code, or fail to cure a default hereunder after entry of an order for relief under Chapter 11 of the Bankruptcy Code, (such Party being hereinafter referred to as "Defaulting or Insolvent Party"), then from and after such date:

   (a)   all acts, consents and decisions with respect to the performance of the Contract or

   the management of the Joint Venture shall thereafter be taken solely by the remaining Party or Parties without considering the Defaulting or Insolvent Party.

   (b)   the participation of the Insolvent Party in the profits of the Joint Venture shall be limited to that proportion with the Defaulting or Insolvent Party's contributions to the working fund of the joint Venture bear to the total of such contributions as same may be modified by and subject to the provisions of paragraph 8(b) hereof, but the Defaulting or Insolvent Party shall be charged with, and shall be liable for, any and all losses that may be suffered by the Joint Venture under said Contract, or any additions or supplements thereto or modifications thereof, to the full extent of the Defaulting or Insolvent Party's percentage of participation, set forth in paragraph thereof.

12.   Project Costs.
   (a)   All costs and charges as proposed by the Parties and agreed by the Executive Committee shall be considered costs of the Project chargeable in the proportion of the participating interest of each Party.

   (b)   A Sponsor management fee of three fourths of one percent (0.75%) of total Project revenue shall be paid to the Sponsor.

   (c)   Travel/subsistence expenses of Board Representatives or other alternates in respect of Executive Committee Meetings shall be borne by each Party unless agreed upon otherwise.

   (d)   No Party without the consent of the other shall make any charges against the Joint

   Venture for any ordinary home office overhead expenses or for time, which may be expended by its officers or employees unless they are employed by the Joint Venture in performing the Contract.

13.   Assignment.   No Party shall assign its interest in the Joint Venture without first obtaining the consent of the other Parties which consent shall not be unreasonably withheld.

14.   Distribution of Remaining Funds.   Upon the termination of the Joint Venture and after providing for or paying all of its obligations, including those to any of the Parties, any profits remaining shall be distributed and divided between the Parties in accordance with their percentage interests in the Joint Venture.   All other assets of the Joint Venture shall be distributed on the same basis.

15.   Improper Payments.   The Parties represent and warrant that, in connection with the business to be conducted under this Agreement, no payment has been or will be made by them or by any of their officers, employees, agents, subsidiary or affiliated companies to any officer, official or employee (or to any agent or other person acting on behalf of such a person) of any nation or national company.

This Agreement shall terminate automatically and without notice upon a Party learning of any violation of this clause and that Party shall have no obligation to pay any amount otherwise owing pursuant to this Agreement.

16.   Settlement of Disputes.

(a)   All disputes arising in connection with this Agreement shall first be referred to senior corporate management of the Parties for settlement.

(b)   In case agreement cannot be reached as per paragraph 16(a), the matter shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules or a court of competent jurisdiction. The locale of the arbitration shall be New York or such other place as may be mutually agreed by the Parties.

(c)   Judgment upon award under arbitration may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order for enforcement as the case may be.   Arbitration and/or attorney fees shall be assessed against the Party against whom the award is determined, or against both Parties if the determination is against both.   The arbitrator/court shall be authorized to award either Party a sum to compensate the Party for the time and expense of the arbitration/suit if the arbitration/suit was demanded without reasonable cause, thereby assessing the costs against the Party instigating arbitration/suit.

17.   Confidential Information.   The Parties agree they will not disclose, either during the term of this Agreement or at any time thereafter, to any person, firm or corporation any information concerning the business or affairs of the other Parties, or any subsidiary, affiliate or partner of the other Parties ("Confidential Information") which a Party may have acquired during the term of this Agreement for his own benefit or for the detriment or intended probable detriment of the other Parties.   The provisions of this paragraph shall apply during the term of this Agreement and shall survive termination of this Agreement.

18.   Conflicts.   In the event that any conflicts shall hereinafter arise between the terms and provisions of this Agreement and the terms and provisions of the Contract, Pre-Bid Agreement or Memorandum of Understanding between the Parties, as the same pertains to the respective rights and obligations of the Joint Venturers hereto as between themselves, the provisions of this Agreement shall control as between the Parties hereto.

19.   Public Statements.   The Joint Venture may make public announcements regarding the Joint Venture in the normal course of business provided that no such announcement shall mention the name of a Party without the Party's written consent.   Neither Party shall make any public announcement or public disclosure with regard to this Agreement, the Joint Venture or, in the case of a Party, the other Party, the Contract or the activities thereunder, including Confidential Information and non-confidential Information, without the prior written consent of the other Party as to the content and timing of such announcement or disclosure, which consent shall not be unreasonably withheld; provided, however, that nothing shall prevent the Joint Venture or a Party from making such an announcement or disclosure which is required by applicable law, regulation or stock exchange rule.

20.   Notices.   All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective when received or, if mailed, on the date set forth on the receipt of registered or certified mail, addressed to the other Party as follows:

Washington International, Inc.
720 Park Boulevard
P. O. Box 73
Boise, Idaho 83729
Attention:     Mr. Patrick L. Pettiette
                     Executive Vice President


Contrack International, Inc.
1001 North 19th Street
Arlington, Virginia 22209

Attention:     Mr. Karim Camel-Toueg
                     President/CEO

MISR Sons Development, S.A.E. Hassan Allam Sons
15, Hassan Allam Street
Heliopolis, Cairo, Egypt

Attention:     Mr. Kamal Allam
                     Chairman


21.   Entire Agreement.   This Agreement embodies the entire understanding and agreement among the Parties concerning the Joint Venture and supersedes any and all prior negotiations, understandings or agreements in regard thereto.

22.    Severability.  If any provision of this Agreement or the application hereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of such provision to any other person or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by applicable law.

23.    Miscellaneous.  This Agreement shall be interpreted under the laws of the State governing the Contract with the Client, and shall not be amended, modified or revoked except in writing signed by all of the Parties, and shall inure to the benefit of and be binding upon the Parties, their successors, trustees, assigns, receivers and legal representatives, but shall not inure to the benefit of any other person, firm or corporation.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

WASHINGTON INTERNATIONAL, INC.

By: _____

Its: _____          I

CONTRACK INTERNATIONAL, INC.

By: _____

Its: _____

MISR SONS DEVELOPMENT S.A.E., HASSAN ALLAM SONS

By: _____

Its: _____

Exhibit G

## LUXOR CONTRACT – STATEMENT OF PAYMENTS

| Voucher | Date Paid | Amount Paid | | Voucher | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|
| 1 | 08/21/2001 | $214,722.00 | | 18 | 02/18/2003 | $1,095,943.00 |
| 2 | 10/29/2001 | $76,419.43 | | 19 | 04/02/2003 | $200,181.00 |
| 3 | 12/13/2001 | $106,708.00 | | 20 | 04/23/2003 | $1,685,939.00 |
| 4 | 01/13/2002 | $196,461.00 | | 21 | 05/26/2003 | $1,522,604.00 |
| 5 | 02/20/2002 | $298,311.00 | | 22 | 06/26/2003 | $1,718,646.00 |
| 6 | 03/14/2002 | $228,022.00 | | 23 | 07/10/2003 | $1,662,551.00 |
| 7 | 03/24/2002 | $542,015.00 | | 24 | 08/25/2003 | $1,709,748.00 |
| 8 | 04/22/2002 | $688,375.00 | | 25 | 09/252003 | $1,661,449.00 |
| 9a | 05/28/2002 | $640,138.18 | | 26 | 10/23/2003 | $1,269,400.00 |
| 9b | 07/21/2002 | $21,696.00 | | 27 | 12/11/2003 | $968,938.00 |
| 10 | 06/23/2002 | $843,002.00 | | 28 | 01/202004 | $2,803,180.00 |
| 11 | 07/15/2002 | $1,110,269.00 | | 29 | 02/10/2004 | $600,851.00 |
| 12 | 07/29/2002 | $1,220,506.00 | | 30 | 03/11/2004 | $487,224.00 |
| 13 | 09/09/2002 | $1,786,166.00 | | 31 | 04/052004 | $532,648.00 |
| 14 | 10/28/2002 | $1,389,752.00 | | 32 | 04/22/2004 | $294,973.00 |
| 15 | 11/18/2002 | $1,339,807.00 | | 33 | 05/26/2004 | $84,951.00 |
| 16 | 12/17/2002 | $1,418,739.00 | | 34 | 06/17/2004 | $40,272.00 |
| 17 | 01/21/2003 | $1,676,655.00 | | 35 | 07/15/2004 | $42,505.00 |

Exhibit G

## EXHIBIT G

Exhibit H

# JOINT VENTURE AGREEMENT

THIS AGREEMENT, made this *13ᵗʰ* day of *FEBRUARY*, 1999 between MORRISON KNUDSEN INTERNATIONAL, INC. ("MKII"), an Nevada corporation, P.O. Box 73, Boise, Idaho 83729, USA, and MISR SONS DEVELOPMENT S.A.E., HASSAN ALAM SONS ("HAS"), an Egyptian corporation, Yehia Zakaria St. Behind Sheraton, Heliopolis, Cairo, Egypt. The entities shall jointly be referred to as "Joint Venturer", "Party" or "Parties".

## WITNESSETH:

WHEREAS, MKII has been prequalified by Egypt Telecom, Ministry of Transport and Communication, Arab Republic of Egypt (the "Client") to bid on Design/Build Telephone Exchange Area Outside Plant Facilities (OSP II), (the "Project"); and

WHEREAS, MKII has received from Client an Invitation for Bid No. 7/97/26 dated October 1998, for the Project; and

WHEREAS, the Parties have agreed to enter into a joint venture agreement (the "Agreement") for the purpose of the joint preparation of a bid (the "Bid") to be submitted in the name of MKII to the Client in response to the Invitation for Bid issued to MKII, and for the joint performance of the Project work in the event that MKII is the successful bidder and is awarded the Contract, and desire to fix and define between themselves their respective interests and liabilities in the performance of the work under said Contract in the event of an award; and

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is agreed as follows:

1.  Creation of Joint Venture. The Parties associate themselves as Joint Venturers for the purpose of preparing and submitting the Bid and performing and completing the Contract for the Project if such Contract is awarded to MKII. The Joint Venture shall operate under the name MK/HAS Joint Venture and all money, equipment, materials, supplies and other property acquired by the Joint Venture shall be held in such name. In the event the MKII is not awarded the Contract for the Project, the Joint Venture shall automatically dissolve and terminate. In either event, each Party shall bear its own expenses in connection with the preparation and submittal of the Bid, except as may be mutually agreed otherwise by and between individual members of the Joint Venture.

This Agreement shall come into force on the date first above mentioned and remain in force until final acceptance of the works by or on behalf of the Client or until the date of approval of the final profit and loss account as referred to in Article 14 hereof, whichever is later, provided that this Agreement shall remain in force thereafter until all rights and obligations which may still exist as against the Client or other third parties have terminated. However, this Agreement shall terminate earlier if either the Bid cannot be agreed upon by the Parties or MKII is not awarded the Contract.

WGI0003611

# EXHIBIT H

However, notwithstanding the above paragraph, this Agreement may be terminated by mutual written consent of the Parties provided that all matters as between the Parties or with third parties have been finally settled.

2. <u>Extent of Joint Venture</u>. It is specifically understood and agreed between the Parties that this Joint Venture Agreement extends only to the preparation and submittal of the Bid and performance of the Contract for the Project, together with any changes or additions thereto or extra work thereunder, but not to other or different work. The Parties agree that neither they nor any of their affiliated companies will participate in any bid to be submitted by a third party for this Project, except by prior written mutual agreement. It is the intent of the Parties that the Bid shall be satisfactory and acceptable to each of the Parties. If any Party is unable to agree upon the Bid, no Bid shall be submitted, and this Joint Venture shall automatically dissolve and terminate. In such event, each Party shall bear its own expenses to the termination date and each of the Parties shall be free to submit their own individual or joint bids for such Project.

3. <u>Sponsoring Party</u>. MK is designated as the Sponsor of the Joint Venture. Subject to the control of the Executive Committee of the Joint Venture, the Sponsor, and authorized officers of the Sponsor, shall (i) have management responsibility for the execution of the Contract; (ii) appoint or employ such officers, employees or agents of the Joint Venture as it deems necessary or appropriate, (iii) bind the Joint Venture with third parties by contract, (iv) receive payments in respect of the work on behalf of the Joint Venture, (v) receive an act upon instructions from the Client, (vi) incur liabilities and settle disputes on behalf of the Joint Venture, and (vii) exercise such powers as are necessary or convenient to fulfill the purposes of the Joint Venture.

4. <u>Executive Committee</u>.

(a) The Executive Committee shall determine general policies affecting the Joint Venture and shall oversee the activities of the Project Manager ("Project Manager") appointed by the Sponsor. Each Party shall be represented on the Executive Committee and shall have one vote, provided that no Party shall exercise any votes during any period of its default under the terms of this Agreement, as defined in paragraph 11.

The Joint Venture shall execute the Project as an autonomous entity under the control of the Executive Committee with the day-to-day operations managed by the Project Manager. The Executive Committee shall:

1. Develop policies affecting the overall performance of the Project.

2. Determine working capital requirements in accordance with the provisions of paragraph 8.

3. Establish bank accounts in accordance with the provisions of paragraph 9.

4. Approve insurance policies, including limits and changes thereto.

5. Approve bonds and any changes thereto.

**WGI0003612**

6.     Approve employing lawyers on behalf of the Joint Venture in excess of any budgets approved in the Bid.

7.     Approve employing consultants on behalf of the Joint Venture in excess of any budgets approved in the Bid.

8.     Approve settlement of claims against the Joint Venture, including claims by subcontractors and suppliers in excess of $25,000.

9.     Approve commencement and conduct of defense or settlement of claims or litigation involving the Joint Venture in excess of $50,000.

10.    Approve subcontracts, purchase orders, sale of assets and lease agreements resulting in costs more than $100,000 above costs included in the Bid.

11.    Approve any collective labor agreements or settlement of disputes resulting therefrom.

12.    Approve any changes or modifications to the Contract in excess of $100,000.

13.    Approve any subcontract or binding agreement between any of the Parties and the Joint Venture.

14.    Approve any changes to the project budget included in the Bid.

15.    Approve all matters of a political, environmental or public relations nature, including the designation of an official spokesperson for the Joint Venture.

16.    Approve the auditors for the Joint Venture.

17.    Approve billing rates of personnel seconded to the project by the Parties and the billing rates for any Party's home office personnel assisting the Project.

18.    Approval of Project Manager appointed by the sponsoring Joint Venture.

The Project Manager shall have authority to manage the operations of the Project and to make all decisions not reserved to the Executive Committee above and take all other actions required to complete the Project, except that the Executive Committee may, from time to time, add to or delete from the above listed activities.

(b)     Each party shall appoint one representative to the Executive Committee and one alternate who shall have authority to act in the representative's absence. Either Party may change its representative or alternate by giving written notice of his successor to the other. Mr. James Voorhees is designated as the initial representative of MKII and Mr. Allan Ahl is designated as the initial alternate representative of MK; Mr. Kamal Allam is designated as

WGI0003613

the initial representative of HAS and Mr. Magdi Allam is designated as the initial alternate representative of HAS.

(c)    The Executive Committee shall be chaired by the representative of the Sponsor. The chairman shall call meetings of the Committee by giving adequate notice to the Parties when it is deemed necessary or whenever requested to do so by any of the Parties. A quorum shall be constituted when all the representative or their alternates are present at the Executive Committee Meeting and no Party shall exercise any votes during any period of its default under the term of this Agreement as defined in Article 11.

(d)    The Executive Committee shall endeavor to act by the unanimous vote of the representatives. In the event a matter cannot be resolved in a timely manner by the Executive Committee, the Sponsor may make a decision based on the best information available where immediate action is required to (i) prevent damage to the Project; (ii) prevent a breach of contract between MKII and the Client or the Joint Venture and any other party; (iii) prevent the unnecessary incurrence of costs on the Project; or (iv) prevent delay in the completion date of the Project. However, the exercise of such decision-making authority by the Sponsor shall not prohibit the other representatives from submitting such matter to arbitration or a court of competent jurisdiction as provided in paragraph 16. The Sponsor's ruling shall remain in force until such time any future Executive Committee shall rescind it or until the issue has been settled in accordance with Arbitration or Court proceedings. If any Party is in default under this Agreement, then during the time of such default, its representative shall not vote upon any issue, and such representative shall not be included in the computation of eligible votes. All actions taken by the Executive Committee shall be confirmed within one week by the Chairman in a written report to the other Executive Committee members.

5.    Liability, Share of Profits and Losses; Contributions  The interests of the Parties in and to any profits and assets derived from the performance of the Contract, and in and to any property acquired by this Joint Venture in connection with the work to be performed thereunder, and in and to all contributions required, all moneys received and losses incurred in the performance of the Contract shall be those percentages set opposite their respective names (the "Sharing Ratio") as follows:

|       |       |
|-------|-------|
| MKII  | 70.0% |
| HAS   | 30.0% |

In the event any Party independently causes direct loss, damage or liability whatsoever to another Party or to any third party ("Indemnitees"), such Party shall hold harmless, indemnify and defend the Indemnitees against such direct loss, damage or liability incurred.   Neither Party shall claim from the other any indirect, consequential, punitive, penalty or liquidated loss, damage or liability save those (if any) which have been adjudged to have been suffered by the Client or a third party as a result of a Party's independent acts or omissions.

Each of the Parties hereby indemnifies the other against any loss or liability, which does not arise by reason of the other Party's negligence or intentional misconduct, sustained in the performance of the Contract which exceeds the amount computed under the stated percentages. Such indemnified amount shall be due and payable within 15 Business Days after written notice thereof and demand

C:\docs\contract\81\jvagr
02-05-99, 4:33 PM

**WGI0003614**

for payment. A "Business Day" shall mean any day other than Friday or Saturday or any legal holiday observed in the Arab Republic of Egypt.

6. <u>Surety Bonds; Financial Obligations</u>. The Parties have agreed that MKII shall arrange for the tender and performance bonds as may be required by the Client; however, any costs incurred by MKII in securing the bonds shall be charged to the Joint Venture. Each of the Parties agrees to execute all applications and indemnity agreements required by the sureties upon any bond or bonds required in connection with the said Bid and Contract. All financial obligations assumed by the Joint Venture in connection with the performance of the Contract, all liabilities assumed by or charged to the Joint Venture as contractor, guarantor or indemnitor in connection with any surety bond or other bonds which may be given or executed in connection with the Bid or Contract, and all other obligations and liabilities of any kind or character which are assumed or undertaken by the Joint Venture in connection with and for the benefit of the performance of the Bid or Contract shall be shared by the Parties proportionately and in accordance with their respective interests as set forth in paragraph 4 hereof, except as set forth in paragraph 1 hereof.

7. <u>Joint Venture Equipment</u>. Equipment necessary for the performance of the Contract may be contributed by one or more of the Parties. In the event equipment is contributed by a Party, the following will apply:

(a) The Executive Committee will determine the fair market value for the equipment. In the event the Executive Committee cannot agree on a fair market value, the value shall be established by an independent equipment appraiser selected by the Executive Committee and hired at the expense of the Joint Venture.

(b) The Executive Committee will thereafter determine whether the equipment will be purchased by the Joint Venture at the established fair market value or rented by the Joint Venture.

(c) If the equipment is to be rented from a Party, the Joint Venture will enter into a rental agreement with the owning Party, which agreement will set forth rental rates, length of rental, responsibility for major and minor repairs and other terms typically found in a standard rental agreement.

(d) In the event the equipment is purchased by the Joint Venture, the Party contributing the equipment will have first right of refusal to repurchase the equipment upon disposal of the equipment by the Joint Venture.

C:\doc\contract\91 Ijvagr
02/05/99, 4:33 PM

WGI0003615

8.   Working Capital.

(a)   All necessary working capital, when and as required for the performance and prosecution of the Contract, as determined by the Executive Committee, shall be furnished by the Parties proportionately in accordance with their respective interests as set forth in paragraph 5 hereof. Each of the Parties recognizes that the failure of any Party to contribute its designated share of working capital will have serious adverse consequences for the Joint Venture and imposes an unfair burden upon the other Party. As to such working capital contribution, each of the Parties waives any rights of set-off it might otherwise possess, and agrees to make the working capital contributions without set-off or deduction of any type. If any Party borrows funds to meet its obligation hereunder, such borrowing shall be the sole and separate obligation of the Party and shall not be the debt or obligation of the Joint Venture. Neither of the Parties, nor their representatives, shall have the power to pledge the credit of the other Party, nor to pledge the joint credit of both the Parties, except by unanimous consent of the Parties.

(b)   The Executive Committee shall determine the working capital needs of the Joint Venture and, to the extent such needs cannot reasonably be met from cash on hand or Project revenues, shall give written notice (a "Capital Call") to the Parties of the amount of cash or other capital that must be contributed by the Parties (a "Capital Contribution").

(c)   Upon receipt of a Capital Call, each Party shall be obligated to make a Capital Contribution as specified in the notice given pursuant to paragraph 8(b) or, if no such period is specified, a period of ten (10) days after the giving of the notice of the Capital Call (the "Capital Call Period") to make a Capital Contribution to the capital of the Joint Venture of cash or other capital specified in the Capital Call in an amount determined by applying the Party☐s Sharing Ratio (as adjusted as of the time of the Capital Call) to the total amount of cash or other capital specified in the Capital Call.

(d)   If any Party fails to make any required payment under this paragraph 8 prior to expiration of the Capital Call Period, the other Party may advance (a "Capital Call Advance") to the Joint Venture any part or all of such required payment. A Capital Call Advance shall be deemed to be an additional Capital Contribution by the advancing Party, and such Party's Sharing Ratio shall be adjusted accordingly as of the time of the making of the Capital Call Advance, except as provided in paragraph 8(f) below.

(e)   Capital Contributions shall be expended in furtherance of the business of the Joint Venture. All costs and expenses of the Joint Venture shall be paid from its funds. No interest shall be paid on Capital Contributions. Except as expressly provided in this Agreement, no Party shall have any personal liability for the repayment of any Capital Contribution made by another Party.

C:\docs\contract 31 1j\vag\
02/05/99, 4:33 PM

WGI0003616

(f)     To the extent either Party pays any liability or obligation to any third party other than the Joint Venture arising out of or in any way connected with this Agreement or the Joint Venture, except for any liabilities or obligations that are the subject of paragraph 6, such payment shall be treated for all purposes of this Agreement, including adjustments of Sharing Ratios, as if such payment were a Capital Contribution made in response to a Capital Call pursuant to paragraph 8(c) of this Agreement; and to the extent any such payment exceeds the amount determined by applying such Party's Sharing Ratio, as adjusted as of the time immediately prior to such payment to the total amount of such liability or obligation, such excess shall be treated, for all purposes of this Agreement, as if such excess were a Capital Call Advance within the meaning of paragraph 8(d) of this Agreement; provided that in the event a portion of a payment made pursuant to this paragraph 8(f) is deemed to be a Capital Call Advance, the Party on whose behalf such Capital Call Advance was made shall have ten (10) days from the making of such advance to reimburse such advance to the paying Party, in which case such reimbursement shall likewise be deemed to be a Capital Contribution for all purposes of this Agreement, including adjustment of Sharing Ratios.

9.     Bank Accounts.  All funds advanced by the Parties or borrowed by the Joint Venture for its account and all progress and final payments or other revenue received as a result of the performance of the Contract shall be deposited to the account of the Joint Venture in an account to be established at such bank or banks as the Executive Committee may designate.  Checks may be drawn on said account or accounts by signatures of such persons as may be designated from time to time by the Executive Committee.  The Joint Venture may also maintain payroll or other accounts at such bank or at such branch or at such other bank as the Executive Committee may designate, which may be drawn upon by the signature or signatures of such persons as may be designated by the Executive Committee.  No part of any advances deposited in said bank account or accounts shall be returned to any of the Parties, and no distribution of profits shall be made, prior to the completion of the Project, except as may be mutually agreed upon by the Parties in writing.

10.    Financial Affairs.  Adequate books of account shall be maintained by the Joint Venture and such books of account may be examined by any of the Parties at all reasonable times. The Joint Venture staff shall make reports of the financial condition of the Joint Venture and the progress of the work shall be made to the Executive Committee no less frequently than quarterly.

11.    Default and Insolvency.  If a Party shall be in default hereunder, and fail to cure such default after written notice or demand, as the case may be, cease to operate or terminate its business affairs, institute an insolvency procedure under applicable law, permit the entry of any order for relief under Chapter 7 of the U.S. Bankruptcy Code or similar law of another country or jurisdiction, or fail to cure a default hereunder after entry of an order for relief under Chapter 11 of the U.S. Bankruptcy Code or similar law of another country or jurisdiction, (such Party being hereinafter referred to as "Defaulting or Insolvent Party"), then from and after such date:

(a) all acts, consents and decisions with respect to the performance of the Contract or the management of the Joint Venture shall thereafter be taken solely by the remaining Party without considering the Defaulting or Insolvent Party.

C:\docs\contract\81 1jv.agr
05:05:99, 4:33 PM

**WGI0003617**

(b)  the participation of the Defaulting or Insolvent Party in the profits of the Joint Venture shall be limited to that proportion which the Defaulting or Insolvent Party's contributions to the working fund of the Joint Venture bear to the total of such contributions as same may be modified by and subject to the provisions of paragraph 8(b) hereof, but the Defaulting or Insolvent Party shall be charged with, and shall be liable for, any and all losses that may be suffered by the Joint Venture under said Contract, or any additions or supplements thereto or modifications thereof, to the full extent of the Defaulting or Insolvent Party's percentage of participation, set forth in paragraph 5 hereof.

12.    Project Costs.
(a)    A Sponsor management fee of one half of one percent (0.50%) of total Project revenue shall be paid to the Sponsor, to be distributed from profits in excess of Bid profit.

(b)    Travel/subsistence expenses of Representatives or alternates in respect of Executive Committee Meetings shall be borne by each Party unless agreed upon otherwise.

(c)    No Party without the consent of the other shall make any charges against the Joint Venture for any ordinary home office overhead expenses or for time which may be expended by its officers or employees unless they are employed by the Joint Venture in performing the Contract.

13.    Assignment.  No Party shall assign its interest in the Joint Venture without first obtaining the consent of the other Party, which consent shall not be unreasonably withheld.

14.    Distribution of Remaining Funds.  Upon the termination of the Joint Venture and after providing for or paying all of its obligations, including those to any of the Parties, any profits remaining shall be distributed and divided between the Parties in accordance with their percentage interests in the Joint Venture.  All other assets of the Joint Venture shall be distributed on the same basis.

15.    Improper Payments.  The Parties represent and warrant that, in connection with the business to be conducted under this Agreement, no improper payment has been or will be made by them or by any of their officers, employees, agents, subsidiary or affiliated companies to any officer, official or employee (or to any agent or other person acting on behalf of such a person) of any nation or national company.

This Agreement shall terminate automatically and without notice upon a Party learning of any violation of this clause and that Party shall have no obligation to pay any amount otherwise owing pursuant to this Agreement.

16.    Settlement of Disputes.

(a)    All disputes arising in connection with this Agreement shall first be referred to senior corporate management of the Parties for settlement.

C:\docs\contract\11jvagr
02.03.99, 4:33 PM

WGI0003618

(b)    In case agreement cannot be reached as per paragraph 16(a), the matter shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules or a court of competent jurisdiction.  The locale of the arbitration shall be New York or such other place as may be mutually agreed by the Parties.

(c)    Judgment upon award under arbitration may be entered in any court having jurisdiction, or application may be made to such court for a judicial acceptance of the award and an order for enforcement as the case may be.  Arbitration and/or attorney fees shall be assessed against the Party against whom the award is determined, or against both Parties if the determination is against both.  The arbitrator/court shall be authorized to award either Party a sum to compensate the Party for the time and expense of the arbitration/suit if the arbitration/suit was demanded without reasonable cause, thereby assessing the costs against the Party instigating arbitration/suit.

17.    <u>Confidential Information</u>.  The Parties agree they will not disclose, either during the term of this Agreement or at any time thereafter, to any person, firm or corporation any information concerning the business or affairs of the other Parties, or any subsidiary, affiliate or partner of the other Parties ("Confidential Information") which a Party may have acquired during the term of this Agreement for his own benefit or for the detriment or intended probable detriment of the other Parties.  The provisions of this paragraph shall apply during the term of this Agreement and shall survive termination of this Agreement.

18.    <u>Conflicts</u>.  In the event that any conflicts shall hereinafter arise between the terms and provisions of this Agreement and the terms and provisions of the Contract, pre-bid agreements or memorandum of understanding between the Parties, as the same pertains to the respective rights and obligations of the Joint Venturers hereto as between themselves, the provisions of this Agreement shall control as between the Parties hereto.

19.    <u>Public Statements</u>.  The Joint Venture may make public announcements regarding the Joint Venture in the normal course of business provided that no such announcement shall mention the name of a Party without the Party's written consent.  Neither Party shall make any public announcement or public disclosure with regard to this Agreement, the Joint Venture or, in the case of a Party, the other Party, the Contract or the activities thereunder, including Confidential Information and non-confidential Information, without the prior written consent of the other Party as to the content and timing of such announcement or disclosure, which consent shall not be unreasonably withheld; provided, however, that nothing shall prevent the Joint Venture or a Party from making such an announcement or disclosure which is required by applicable law, regulation or stock exchange rule.

C:\docs\contract\8\11jvagr
02-05-99, 4:33 PM

WGI0003619

20.   <u>Notices</u>.  All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective when received or, if mailed, on the date set forth on the receipt of registered or certified mail, addressed to the other Party as follows:

Morrison Knudsen Corporation
720 Park Boulevard
P. O. Box 73
Boise, Idaho 83729
Attention:   <u>Mr. Patrick L. Pettiette</u>
                                              (Name)
                   <u>Executive Vice President</u>
                                              (Title)


MISR Sons Development, S.A.E. Hassan Allam Sons
Yehia Zakaria St. Behind Sheraton
Heliopolis, Cairo, Egypt
Attention:   <u>Mr. Kamal Allam</u>
                                              (Name)
                                              _____
                                              (Title)

21.   <u>Entire Agreement</u>.  This Agreement embodies the entire understanding and agreement among the Parties concerning the Joint Venture and supersedes any and all prior negotiations, understandings or agreements in regard thereto.

22.   <u>Severability</u>.  If any provision of this Agreement or the application hereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of such provision to any other person or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by applicable law.

23.   <u>Miscellaneous</u>.  This Agreement shall be interpreted under the laws of the State of New York, U.S.A., and shall not be amended, modified or revoked except in writing signed by the Parties, and shall inure to the benefit of and be binding upon the Parties, their successors, trustees, assigns, receivers and legal representatives, but shall not inure to the benefit of any other person, firm or corporation.

C:\data\contract\811jvagr
02/05/99, 4:33 PM

WGI0003620

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

MORRISON KNUDSEN INTERNATIONAL, INC.

By: _____

Its _EXECUTIVE VICE PRESIDENT_

MISR SONS DEVELOPMENT S.A.E., HASSAN ALAM SONS

By: _Kamal Allam_

Its _MANAGING DIRECTOR_

C:\doc\contract\811jvagr
02/05/99, 4:33 PM

WGI0003621

Exhibit I

## ISMAILIA CONTRACT – SCHEDULE OF PAYMENTS

| Voucher | Date Paid | Amount Paid | Voucher | Date Paid | Amount Paid |
|---------|-----------|-------------|---------|-----------|-------------|
| 1 | 04/26/1993 | $2,331,674.00 | 25 | 05/03/1995 | $1,335,894.00 |
| 2 | 05/23/1993 | $1,961,736.00 | 26 | 06/04/1995 | $3,021,249.00 |
| 3 | 07/05/1993 | $2,014,924.00 | 27 | 07/02/1995 | $698,682.00 |
| 4 | 07/05/1993 | $2,454,692.00 | 28 | 07/24/1995 | $1,461,345.00 |
| 5 | 08/24/1993 | $703,464.00 | 29 | 09/13/1995 | $2,298,512.00 |
| 6 | 09/21/1993 | $989,726.00 | 30 | 9/26/1995 | $1,308,025.00 |
| 7 | 11/09/1993 | $953,041.00 | 31 | 10/29/1995 | $1,026,206.00 |
| 8 | 12/06/1993 | $724,518.00 | 32 | 12/04/1995 | $701,212.00 |
| 9 | 12/20/1993 | $853,874.00 | 33 | 01/24/1996 | $650,905.00 |
| 10 | 01/12/1994 | $888,101.00 | 34 | 03/07/1996 | $1,064,509.00 |
| 11 | 02/23/1994 | $851,469.00 | 35 | 04/14/1996 | $457,221.00 |
| 12 | 03/28/1994 | $1,768,747.00 | 36 | 06/05/1996 | $467,561.00 |
| 13 | 04/26/1994 | $1,122,556.00 | 37 | 07/08/1996 | $726,071.00 |
| 14 | 05/26/1994 | $944,569.00 | 38 | 08/22/1996 | $884,200.00 |
| 15 | 06/27/1994 | $1,537,054.00 | 39 | 09/19/1996 | $425,304.00 |
| 16 | 07/20/1994 | $1,050,425.00 | 40 | 12/03/1996 | $604,626.00 |
| 17 | 08/21/1994 | $892,396.00 | 41 | 01/09/1997 | $238,015.00 |
| 18 | 09/25/1994 | $1,641,125.00 | 42 | 02/11/1997 | $414,577.00 |
| 19 | 10/26/1994 | $4,188,775.00 | 43 | 04/02/1997 | $210,355.00 |
| 20 | 11/23/1994 | $3,157,079.00 | 44 | 04/22/1997 | $259,647.00 |
| 21 | 12/26/1994 | $2,918,020.00 | 45 | 05/13/1997 | $242,117.00 |
| 22 | 01/22/1995 | $2,746,213.00 | 46 | 06/16/1997 | $360,802.00 |
| 23 | 03/05/1995 | $3,279,581.00 | 47 | 10/21/1997 | $650,030.00 |
| 24 | 04/03/1995 | $3,864,418.00 | 48 | 11/12/1997 | $129,970.00 |

Exhibit I

## EXHIBIT I

| Voucher | Date Paid | Amount Paid | | Voucher | Date Paid | Amount Paid |
|---------|-----------|-------------|---|---------|-----------|-------------|
| 49 | 11/25/1997 | $249,965.00 | | 65 | 07/11/1999 | $1,883,744.00 |
| 50 | 01/06/1998 | $147,013.00 | | 66 | 08/22/1999 | $1,838,960.00 |
| 51 | 02/15/1998 | $109,210.00 | | 67 | 09/27/1999 | $1,646,523.00 |
| 52 | 03/24/1998 | $113,385.00 | | 68 | 10/25/1999 | $1,339,614.00 |
| 53 | 06/11/1998 | $969,505.00 | | 69 | 11/09/199 | $1,613,324.00 |
| 54 | 08/25/1998 | $750,291.00 | | 70 | 2/12/1999 | $1,792,997.00 |
| 55 | 09/17/1998 | $92,784.00 | | 71 | 01/27/2000 | $1,586,802.00 |
| 56 | 09/20/1998 | $248,822.00 | | 72 | 02/16/2000 | $1,933,974.00 |
| 57 | 10/28/1998 | $421,413.00 | | 73 | 03/27/2000 | $1,159,384.00 |
| 58 | 12/03/1998 | $1,023,615.00 | | 74 | 04/09/2000 | $743,649.00 |
| 59 | 02/17/1999 | $794,379.00 | | 75 | 05/17/2000 | $713,088.00 |
| 60 | 02/24/1999 | $898,709.00 | | 76 | 06/14/2000 | $692,812.00 |
| 61 | 30/08/1999 | $1,213,021.00 | | 77 | 06/06/2000 | $56,396.00 |
| 62 | 04/07/1999 | $1,029,064.00 | | 78 | 08/14/2000 | $146,258.00 |
| 63 | 05/12/1999 | $1,494,850.00 | | 79 | 08/27/2000 | $11,620.00 |
| 64 | 06/08/1999 | $1,036,751.00 | | 80 | 10/12/2000 | $19,942.00 |

Exhibit 1

Exhibit J

## PORT SAID CONTRACT – SCHEDULE OF PAYMENTS

| No. | Date Paid | Amount Paid | No. | Date Paid | Amount Paid |
|-----|-----------|-------------|-----|-----------|-------------|
| 1 | 05/04/1994 | $4,214,367.00 | 25 | 05/13/1996 | $4,110,352.00 |
| 2 | 06/14/1994 | $3,149,785.00 | 26 | 06/23/1996 | $2,459,871.00 |
| 3 | 07/10/1994 | $2,232,591.00 | 27 | 07/21/1996 | $2,989,981.00 |
| 4 | 08/01/1994 | $2,367,535.00 | 28 | 08/04/1996 | $2,554,931.00 |
| 5 | 09/07/1994 | $2,908,992.00 | 29 | 09/03/1996 | $2,241,227.00 |
| 6 | 10/11/1994 | $1,815,346.00 | 30 | 09/19/1996 | $2,788,577.00 |
| 7 | 11/17/1994 | $2,839,986.00 | 31 | 11/07/1996 | $3,151,908.00 |
| 8 | 12/06/1994 | $1,228,947.00 | 32 | 12/18/1996 | $2,351,840.00 |
| 9 | 01/03/1995 | $1,186,253.00 | 33 | 01/26/1997 | $1,133,713.00 |
| 10 | 02/09/1995 | $589,350.00 | 34 | 03/20/1997 | $1,366,529.00 |
| 11 | 03/09/1995 | $742,331.00 | 35 | 03/20/1997 | $3,985,318.00 |
| 12 | 04/10/1995 | $1,018,134.00 | 36 | 04/24/1997 | $896,630.00 |
| 13 | 05/08/1995 | $651,375.00 | 37 | 05/15/1997 | $1,482,137.00 |
| 14 | 06/11/1995 | $1,327,764.00 | 41 | 01/22/1998 | $84,008.00 |
| 15 | 07/02/1995 | $757,311.00 | 42 | 03/08/1998 | $40,071.00 |
| 16 | 07/06/1995 | $1,715,206.00 | 43 | 05/07/1998 | $1,432,275.00 |
| 17 | 09/13/1995 | $868,895.00 | 44 | 06/04/1998 | $534,350.00 |
| 18 | 10/10/1995 | $1,288,259.00 | 45 | 07/26/1998 | $466,908.00 |
| 19 | 11/09/1995 | $1,146,119.00 | 46 | 08/19/1998 | $728,515.00 |
| 20 | 12/14/1995 | $1,959,763.00 | 47 | 09/10/1998 | $566,292.00 |
| 21 | 01/09/1996 | $1,103,801.00 | 48 | 10/11/1998 | $684,227.00 |
| 22 | 02/25/1996 | $2,566,064.00 | 49 | 11/16/1998 | $1,131,028.00 |
| 23 | 03/18/1996 | $2,520,201.00 | 50 | 12/03/1998 | $1,597,527.00 |
| 24 | 04/18/1996 | $3,086,279.00 | 51 | 01/10/1999 | $1,192,920.00 |

Exhibit J

## EXHIBIT J

| No. | Date Paid | Amount Paid | No. | Date Paid | Amount Paid |
|---|---|---|---|---|---|
| 52 | 01/27/1999 | $984,503.00 | 62 | 12/20/1999 | $1,741,830.00 |
| 53 | 03/04/1999 | $1,228,361.00 | 63 | 01/19/2000 | $1,488,266.00 |
| 54 | 04/07/1999 | $1,132,535.00 | 64 | 02/23/2000 | $2,361,609.00 |
| 55 | 05/12/1999 | $1,286,175.00 | 65 | 03/26/2000 | $2,362,045.00 |
| 56 | 06/15/1999 | $1,760,832.00 | 66 | 04/09/2000 | $899,701.00 |
| 57 | 07/26/1999 | $965,939.00 | 67 | 05/16/2000 | $905,736.00 |
| 58 | 08/16/1999 | $1,327,434.00 | 68 | 06/19/2000 | $1,065,677.00 |
| 59 | 09/12/1999 | $1,419,652.00 | 69 | 07/21/2000 | $1,121,663.00 |
| 60 | 10/27/1999 | $1,308,602.00 | 70 | 08/21/2000 | $385,291.00 |
| 61 | 11/23/1999 | $1,394,535.00 | 71 | 09/27/2000 | $464,273.00 |
|  |  |  | 72 | 10/12/2000 | $315,561.00 |

Exhibit J

JS 44 (Rev. 3/99)

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
UNITED STATES OF AMERICA

**DEFENDANTS**
Washington Group International, Inc. f/k/a Morrison Knudsen Corporation; Contrack International, Inc.; and Misr Sons Development S.A.E. a/k/a Hassan Allam Sons

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney'S (Firm Name, Address, and Telephone Number)

(See attached sheet)

Attorneys (If Known)

(See attached sheet)

CIV - 04  5555 EJL

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X " in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☒ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | | ☐ 550 Civil Rights | | | |
| ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

False Claims Act, 31 U.S.C. §§ 3729-33; Foreign Assistance Act, 22 U.S.C., § 2399b.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____ DOCKET NUMBER _____

DATE
11-05-2004

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

This form was electronically produced by Elite Federal Forms, Inc.

ORIGINAL

Civil Cover Sheet
Attachment

## (C) Plaintiff's Attorneys

**United States of America:**
Carolyn G. Mark
Department of Justice
Commercial Litigation Branch
P.O. Box 261
Benjamin Franklin Station
Washington, DC 20044
Telephone: (202) 307-0256
Facsimile: (202) 514-7361

Alan G. Burrow
Assistant United States Attorney
U.S. Attorney's Office, District of Idaho
MK Plaza, Plaza IV
800 Park Blvd., Suite 600
Boise, ID 83712-9903
Telephone: (208) 334-1211
Facsimile: (208) 334-1414

## Defendant's Attorneys

**Washington Group International f/k/a
Morrison-Knudsen International:**
Stephen D. Knight (703) 847-6284
Mark E. Hanson (703) 847-6285
Smith, Pachter, McWhorter & allen PLC
8000 Towers Crescent Drive, Suite 900
Vienna, VA 22182

Peter F. Garvin III
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001-2113
(202) 879-5436

**Contrack, Inc.:**
Michael B. Hubbard (202) 828-3542
Kevin Connelly (202) 828-5374
Seyfarth Shaw
815 Connecticut Ave., NW
Suite 500
Washington, DC 20006-4004

**Hassan Allam Sons:**
Dr. Bahieldin Elibrachy
Ibrachy & Dermarkar
Cairo, Egypt
+20-2-760-4592